## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SANDRA K. SHOEMAKER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CARDIOVASCULAR SYSTEMS, INC. and LAURENCE L. BETTERLEY, <br><br> Defendants. | No. 0:16-cv-00568-DWF-TNL <br><br> Hon. Donovan W. Frank <br><br> Jury Trial Demanded |

## FIRST AMENDED CLASS ACTION COMPLAINT

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
David A. Goodwin (#386715)
Daniel J. Nordin (#392393)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
      dhedlund@gustafsongluek.com
      dgoodwin@gustafsongluek.com
      dnordin@gustafsongluek.com

*Liaison Counsel for Lead Plaintiffs Norfolk County Retirement System and Wayne County Employees' Retirement System*

**LOCKRIDGE GRINDAL NAUEN PLLP**
Richard A. Lockridge (#64117)
Gregg M. Fishbein (#202009)
Kate Baxter-Kauf (#0392037)

**LABATON SUCHAROW LLP**
Michael W. Stocker
David J. Goldsmith
Alfred L. Fatale III
Ross M. Kamhi
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mstocker@labaton.com
      dgoldsmith@labaton.com
      afatale@labaton.com
      rkamhi@labaton.com

*Attorneys for Lead Plaintiffs Norfolk County Retirement System and Wayne County Employees' Retirement System and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jeremy P. Robinson
Angus Fei Ni
1251 Avenue of the Americas

100 Washington Ave. S
Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 596-4044
Facsimile: (612) 339-0981
E-mail: ralockridge@locklaw.com
          gmfishbein@locklaw.com
          kmbaxter-kauf@locklaw.com

*Liaison Counsel for Lead Plaintiff City of
Miami Fire Fighters' & Police Officers'
Retirement Trust*

New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jeremy@blbglaw.com
          angus.ni@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami
Fire Fighters' & Police Officers'
Retirement Trust and Co-Lead Counsel for
the Class*

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................. 2

II.  JURISDICTION AND VENUE .......................................................... 10

III.  PARTIES ............................................................................................ 11

    A.  Lead Plaintiffs ........................................................................... 11

    B.  Defendants .................................................................................. 12

IV.  RELEVANT NON-PARTY ................................................................ 13

V.  FACTUAL ALLEGATIONS .............................................................. 13

    A.  Overview Of The Company And Its Business ............................ 13

    B.  The Anti-Kickback Statute Prohibits The Giving Of "Anything Of Value" In Order To Induce Purchases Of A Company's Products ............. 16

    C.  CSI's Systemic Use Of And Reliance On  Illegal Sales Practices To Improperly Boost Sales ............................................................... 18

        1.  Evidence Submitted In The *Babyak*  Action Confirms CSI's Improper *Quid Pro  Quo* Referral Marketing in Violation of the AKS ............................................................. 18

        2.  Former CSI Sales Representatives Have  Confirmed CSI's Improper *Quid Pro Quo*  Referral Marketing in Violation of the AKS ............................................................. 27

        3.  CSI's Improper Referrals Are Confirmed  By Facts Alleged In The *Qui Tam* Complaint ............................................. 31

        4.  CSI's Settlement with the DOJ and its Corporate  Integrity Agreement Confirm CSI's Improper  *Quid Pro Quo* Referral Marketing in Violation of the AKS ................................... 32

VI.  ADDITIONAL SCIENTER ALLEGATIONS ..................................... 34

    A.  The Nature Of The Alleged Illegality As Well As Defendants' Own Statements And Actions Contribute To A Strong Inference Of Scienter ....................................................................................... 35

    B.     Suspicious Stock Sales By CEO Martin and CFO Betterley During The Class Period Contributes To A Strong Inference Of Scienter ............ 40

    C.     A Separate *Qui Tam* Settlement Involving Martin's Prior Company Contributes To A Strong Inference Of Scienter ........................................... 44

VII.    THE TRUTH EMERGES ...................................................................... 44

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ............................... 50

    A.     September 12, 2011 – Fiscal Year 2011 Annual Report ........................... 50

    B.     October 6, 2011 – Q1 2012 Press Release .................................................. 55

    C.     October 6, 2011 – Q1 2012 Earnings Call .................................................. 56

    D.     November 8, 2011 – Q1 2012 Form 10-Q .................................................. 57

    E.     February 7, 2012 – Q2 2012 Press Release ................................................ 59

    F.     February 7, 2012 – Q2 2012 Earnings Call ................................................ 60

    G.     February 9, 2012 – Q2 2012 Form 10-Q .................................................... 60

    H.     May 2, 2012 – Q3 2012 Press Release ........................................................ 62

    I.     May 2, 2012 – Q3 2012 Earnings Call ........................................................ 63

    J.     May 8, 2012 – Q3 2012 Form 10-Q ............................................................ 64

    K.     August 8, 2012 – Q4 2012 Press Release .................................................... 66

    L.     August 8, 2012 – Q4 2012 Earnings Call .................................................... 67

    M.    September 10, 2012 – Fiscal Year 2012 Annual Report ........................... 67

    N.     October 30, 2012 – Q1 2013 Press Release ................................................ 70

    O.     October 30, 2012 – Q1 2013 Earnings Call ................................................ 71

    P.     November 8, 2012 – Q1 2013 Form 10-Q .................................................. 72

    Q.     January 30, 2013 – Q2 2013 Press Release ................................................ 73

    R.     January 30, 2013 – Q2 2013 Earnings Call ................................................ 74

S.      February 8, 2013 – Q2 2013 Form 10-Q .......................................................75

T.      March 20, 2013 – Prospectus ....................................................................77

U.      May 1, 2013 – Q3 2013 Press Release .......................................................78

V.      May 1, 2013 – Q3 2013 Earnings Call ........................................................78

W.      May 9, 2013 – Q3 2013 Form 10-Q ............................................................80

X.      August 7, 2013 – Q4 2013 Press Release....................................................81

Y.      August 7, 2013 – Q4 2013 Earnings Call ....................................................82

Z.      September 11, 2013 – Fiscal Year 2013 Annual Report.............................83

AA.     October 30, 2013 – Q1 2014 Press Release ................................................85

BB.     October 30, 2013 – Q1 2014 Earnings Call ................................................86

CC.     November 4, 2013 – Q1 2014 Form 10-Q ...................................................87

DD.     November 21, 2013 - Prospectus .................................................................88

EE.     January 29, 2014 – Q2 2014 Press Release.................................................89

FF.     January 29, 2014 – Q2 2014 Earnings Call.................................................89

GG.     February 7, 2014 – Q2 2014 Form 10-Q......................................................91

HH.     April 30, 2014 – Q3 2014 Press Release......................................................92

II.     April 30, 2014 – Q3 2014 Earnings Call......................................................93

JJ.     May 8, 2014 – Q3 2014 Form 10-Q..............................................................94

KK.     May 9, 2014 – Notice of Department of Justice Investigation ...................95

LL.     August 6, 2014 – Q4 2014 Press Release.....................................................96

MM.     August 6, 2014 – Q4 2014 Earnings Call.....................................................97

NN.     August 28, 2014 – Fiscal Year 2014 Annual Report ..................................97

OO.     October 29, 2014 – Q1 2015 Press Release ..............................................100

PP.     October 29, 2014 – Q1 2015 Earnings Call ..............................................102

QQ.   November 7, 2014 – Q1 2015 Form 10-Q ................................................. 103

RR.   January 28, 2015 – Q2 2015 Press Release................................................ 104

SS.   January 28, 2015 – Q2 2015 Earnings Call................................................ 105

TT.   February 6, 2015 – Q2 2015 Form 10-Q.................................................... 106

UU.   April 29, 2015 – Q3 2015 Press Release.................................................... 107

VV.   April 29, 2015 – Q3 2015 Earnings Call.................................................... 108

WW.  May 8, 2015 – Q3 2015 Form 10-Q.......................................................... 109

XX.   August 5, 2015 – 4Q 2015 Press Release.................................................. 111

YY.   August 27, 2015 – Fiscal Year 2015 Annual Report ................................. 113

ZZ.   October 7, 2015 – Q1 2016 Press Release ................................................. 116

AAA. November 4, 2015 – Q1 2016 Earnings Call ............................................. 117

BBB. November 6, 2015 – 1Q 2016 Form 10-Q ................................................. 118

CCC. January 21, 2016 – Q2 2016 Press Release and Earnings Call................. 120

DDD. Defendants' Wrongful Conduct ................................................................ 122

IX.    LOSS CAUSATION/ECONOMIC LOSS ........................................................... 123

X.     CLASS ACTION ALLEGATIONS...................................................................... 129

XI.    ADDITIONAL CONTROL PERSON ALLEGATIONS ..................................... 131

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE
       AFFILIATED *UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE,
       THE FRAUD ON THE MARKET DOCTRINE.................................................. 134

XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR................................. 135

XIV.   CAUSES OF ACTION........................................................................................ 136

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b)
       Promulgated Thereunder Against All Defendants ............................................... 136

COUNT II Violation of Section 20(a) of the Exchange Act Against Defendant
       Betterley ............................................................................................................. 141

XV.    PRAYER FOR RELIEF ........................................................................................ 143

XVI.   JURY TRIAL DEMANDED ................................................................................. 143

Court-appointed Lead Plaintiffs City of Miami Fire Fighters' & Police Officers'

Retirement Trust, Norfolk County Retirement System, and Wayne County Employees'

Retirement System (collectively, "Lead Plaintiffs") by and through their undersigned

counsel, bring this securities class action on behalf of themselves and all persons and

entities that, between September 12, 2011 and January 21, 2016, inclusive (the "Class

Period"), purchased or otherwise acquired the common stock of Cardiovascular Systems,

Inc. ("CSI" or the "Company"), and were damaged thereby (the "Class").  Lead Plaintiffs

bring this class action against CSI and Laurence L. Betterley ("Betterley") (together, with

CSI, the "Defendants") to recover damages proximately caused to the Class by

Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of

1934 (the "Exchange Act").[1]

---

[1] These allegations are based on Lead Plaintiffs' personal knowledge as to themselves and their own acts and on information and belief as to Defendants' acts and all other matter.  Such information and belief is based upon all of the facts set forth below, which were obtained through an ongoing investigation conducted by Co-Lead Counsel Labaton Sucharow LLP and Bernstein Litowitz Berger & Grossmann LLP.  Co-Lead Counsel's investigation on Lead Plaintiffs' behalf has included, among other things, (i) a review of reports filed by CSI with the U.S. Securities and Exchange Commission ("SEC") and other regulatory reports filed by CSI; (ii) press releases and other public statements issued by CSI; (iii) securities analysts' reports concerning CSI; (iv) media and news reports concerning CSI; (v) data and other information concerning CSI securities; (vi) documents, including internal CSI documents, publicly filed in litigation matters in which CSI is named as a defendant, including *United States ex rel. Thams v. Cardiovascular Systems, Inc.*, No. 13-cv-00404 (W.D.N.C.) (the "*Qui Tam* Action"), and *Steven Babyak v. Cardiovascular System Inc.*, No. BC601259 (Cal. Super. Ct.) (the "Babyak Action"); (vii) documents publicly filed in litigation matters that concern CSI and its current and former employees, including *United States ex rel. Cashi v. Fox Hollow Technologies, Inc.*, No. 09-cv-01066-S (W.D.N.Y.) (the "Fox Hollow Action"); (viii) other publicly available information concerning Defendants; (ix) interviews of former employees of CSI and other persons with knowledge of the matters alleged herein; (x) information received from the U.S. Department of Health and Human Services

## I.    NATURE OF THE ACTION

1.     This securities class action arises from Defendants' materially false and misleading statements to investors concerning the source, stability, and growth of revenues derived from the sale of key medical devices, as well as their purportedly scrupulous compliance with laws and regulations governing the marketing and sales of those same devices.  Unbeknownst to investors, during the Class Period, Defendants were engaged in a widespread fraudulent scheme to artificially inflate revenues through illegal sales tactics, including violations of the federal Anti-Kickback Statute ("AKS") and federal False Claims Act ("FCA") in the form of *quid pro quo* arrangements with physician-customers to induce purchases of CSI products.

2.     CSI is a medical technology company that develops, manufactures, and markets medical devices for the treatment of peripheral and coronary arterial diseases.  Specifically, the Company sells catheters designed to eliminate calcified plaque that accumulates on blood vessel walls.  CSI employs this technology in its peripheral arterial disease ("PAD") devices.  These products include: (i) the Stealth 360° Peripheral Orbital Atherectomy System ("OAS"), and (ii) the Diamondback 360º Peripheral OAS (together, the "PAD Devices").

3.     Throughout the Class Period, Defendants consistently represented to investors that CSI's sales and promotional practices regarding the PAD Devices, which

---

("HHS") in response to requests made pursuant to the Freedom of Information Act ("FOIA"); and (xi) discussions with consulting experts.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

purportedly generated year after year of double-digit growth in sales revenues, rigorously complied with legal and ethical standards. For example, Defendants repeatedly assured investors that "[b]ribery, kickbacks or other improper or illegal payments have no place in CSI's business;" that CSI "compli[ed] with all laws and regulations applicable to [its] business;" and that the Company "maintain[ed] rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements." CEO David L. Martin also frequently touted the growth of PAD Device sales, boasting of CSI's "double-digit growth," highlighting CSI's plans "to accelerate and drive our next stage of growth in the PAD market," and touting CSI's "growth potential going forward." Thus, Defendants portrayed the Company's revenues from the sale of PAD Devices to be legal, stable, and sustainable, with growth driven by superior technology, sales management, and clinical science.

4. In reality, the Company's sales and growth figures were the unsustainable result of systematic reliance on illegal sales tactics. Contrary to the picture of legal compliance and stable growth presented to investors, Defendants were engaged in a widespread scheme to increase sales and inflate revenues through unsustainable and illegal tactics. Core to this scheme was the Company-wide adoption of a unique *quid pro quo* kickback arrangement to drive sales in the following pattern: interventional cardiologists or cardiovascular surgeons—CSI's main customers—were promised that if they purchased CSI's medical devices, then CSI would conduct marketing on the doctors' behalf and bolster the doctors' practice by driving referrals to the doctor from various nearby referring physicians such as podiatrists. This practice violated the Anti-Kickback

Statute because CSI was knowingly offering, and paying, the physicians "remuneration" in the form of patient referrals and marketing efforts that were specifically intended to—and did—induce product purchases that were subject to reimbursement by a federal health care programs such as Medicare and Medicaid.  Indeed, as CSI acknowledged in, for example, its 2014 Form 10-K, Defendants expected that doctors and hospitals would be seeking "reimbursement from various public . . . payors, such as Medicare [and] Medicaid" with respect to the PAD Devices.  A violation of the AKS constitutes a violation of the Federal False Claims Act ("FCA"), when medical products that were prescribed or purchased as a result of violations of the AKS results in submission of reimbursement claims to the federal government.  42 U.S.C. § 1320a-7b(g).

5.      As detailed herein, Defendants' illegal sales tactics have been confirmed through multiple sources, including: (i) evidence, including internal documentation, submitted in *Babyak v. Cardiovascular Systems Inc.*, a California lawsuit brought by a former CSI sales representative, who won a $25 million jury verdict against CSI for terminating him in retaliation for reporting illegal marketing and sales tactics; (ii) statements by former employees, including CSI sales representatives ("sales reps") with direct knowledge of the practices alleged herein; and (iii) CSI's settlement with the government to resolve claims of illegal kickbacks to physicians.

6.      Documents, affidavits, and verified interrogatories filed publicly in the Babyak Action show CSI executives were involved in a "Triangle Offense" program, which was used to push sales reps to illegally steer referrals to doctors expressly in order to induce purchases of CSI's PAD devices.  As described by one senior CSI official to

sales reps: "***the Triangle Offense gives you control. If you own the bottom base of the triangle (referring physicians) you will control the top point of the triangle (physician end user). If the physician end user isn't a loyalist then we can steer referrals to someone that is loyal because we control the referral spigot***."[2]  The official told sales reps to "***[g]et an agreement [from the customer] that you will market for them as long as he uses our device***."  According to internal CSI documents, the Triangle Offense program was modeled on a similar program developed by Jim Breidenstein, who was hired by and reported to CEO Martin and CFO Betterley to oversee sales company-wide. Indeed, e-mails submitted in the Babyak Action show that Jim Breidenstein personally instructed Mr. Babyak to "stop" raising complaints about the Triangle Offense program after he had made multiple attempts to file complaints with the Company about its legality.

7.     CSI's "Triangle Offense" program and similar referral marketing programs were illegal because the Anti-Kickback Statute specifically prohibits the payment or advancement of "any remuneration . . . directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order . . . any good . . . or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S. Code § 1320a–7b(b)(2)(B).  Here, "remuneration" has been defined to mean "anything of value" by the Office of the Inspector General of the Department of Health and Human Services.  *See* OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed. Reg. 14245, 14252 (Mar. 24, 2003).  By explicitly offering

---

[2] All emphasis added, unless otherwise noted.

to generate business for physician-customers through CSI-orchestrated referrals in return

for purchases of CSI's product, CSI offered something "of value" as a part of a *quid pro*

*quo* strategy to induce purchases of its product.

8.      CSI's illegal sales tactics are also confirmed by multiple former employees

with direct knowledge of these practices.  For example, a former CSI District Sales

Manager in Washington, Travis Thams (the "CSI Whistleblower") filed a *Qui Tam* suit

against CSI alleging that the Company instituted a "fraudulent marketing scheme . . . to

maximize its profits through an ongoing pattern of fraud and deception involving illegal

kickbacks . . . and violations of FDA laws and regulations in connection with its medical

devices used for the treatment of Peripheral Arterial Disease" including "CSI's

Diamondback 360 device, Predator 360 device and Stealth 360 device."  *See infra*,

Paragraphs 64-68.  Other former CSI District Sales Managers likewise confirmed that

CSI engaged in referral marketing, including, for example, by telling the physicians that

if they bought and used CSI devices, CSI would go out and generate referrals for them.

9.      CSI's illegal kickback scheme is further confirmed by the Company's

multi-million-dollar settlement of a Department of Justice ("DOJ") investigation, which

resolved the DOJ's claim that "CSI knowingly and willfully offered or paid remuneration

to physicians . . . in the form of marketing arrangements and practice development

activities . . . in a manner intended to induce the [physicians] to use CSI's products in

violation of the federal Anti-Kickback Statute."  Indeed, as part of this settlement, CSI

entered into a Corporate Integrity Agreement designed to curb its illegal sales tactics,

including by requiring the Company to:

- affirmatively report "violation[s] of . . . laws applicable to any Federal health care program";

- establish procedures ensuring that its marketing activities are conducted in compliance with the law; and

- "monitor[] and review . . . sales representatives' interactions with [physicians] (including . . . any payments to [physicians])."

10.     CSI's fraudulent scheme was knowingly or recklessly encouraged by executives at the very top of the Company, including CEO Martin and CFO Betterley. During the Class Period, these executives repeatedly touted the revenues and growth potential derived from sales of PAD Devices as well as the fact that they had hired and worked closely with the very CSI officials that former CSI employees and CSI's internal documents identify as having devised the illegal practices at issue in this lawsuit. Both Martin and Betterley knew of—or had unfettered access to information about but recklessly disregarded—the illegal sales tactics employed by CSI to drive up sales. Indeed, according to sworn testimony produced in the Babyak Action, CEO Martin would even get directly involved in the details of sales at CSI by giving, for example, "final approval" to sales quotas.

11.     Moreover, during the Class Period, both Martin and Betterley engaged in a highly suspicious pattern of insider trading—as they together sold over *800,000* shares worth of their personally held CSI common stock, generating more than *$21 million* in proceeds. Martin's and Betterley's Class Period sales represented a *700%* increase over

the CSI common stock that they had sold for the prior two-year period, and in turn

generated profits of more than *1,800%* over the prior period.

12.     These illegal and illicit sales tactics were used to sell and promote products

that provided CSI with more than *88%* of its revenues.  Dependent on and inflated by

illegal sales tactics, however, CSI's sales of PAD Devices were highly unstable, likely to

lead to regulatory sanctions, a drop in sales, and a consequent fall in CSI's stock

price.  To be sure, by the end of the Class Period, this is precisely what happened,

resulting in enormous losses for investors.  Thus, the Company's revenue figures and

touted "double-digit" growth during the Class Period largely *depended* on its systematic

violations of applicable laws and regulations, as well as its and artificial inflation of sales

numbers to boost the sales of the Company's products, and in turn, its share prices.

13.     As detailed below, the truth concerning Defendants' fraudulent scheme

began to emerge on May 9, 2014, when the Company announced that it had received

notice that the United States Attorney's Office for the Western District of North Carolina

(the "USAO") was investigating the Company "to determine whether the Company has

violated the False Claims Act, resulting in the submission of false claims to federal and

state health care programs, including Medicare and Medicaid."  On this news, the price of

CSI shares declined $2.51 per share, or more than 8%, from an open of $29.94 per share

on May 12, 2014, to close at $27.43 per share that day.

14.     Realizing that it would need to curb its illegal sales tactics in the wake of

this government investigation, the Company began to reform its illegal practices.  Thus,

in an effort to stave off the inevitable revenue declines, CSI announced that it would

"optimiz[e]" and expand its sales force.  This strategy was designed to both make up for and hide the loss of CSI's sales resulting from illegal business practices.  However, CSI's efforts to mask the revenue declines resulting from the drop-off in illegal activity ultimately failed, as the Company was forced to announce quarter after quarter of disappointing financial results.

15.     As detailed below in Paragraphs 103 through 108, when announcing quarterly results on each of April 29, 2015, August 5, 2015,  October 7, 2015, and January 21, 2016, CSI revealed disappointing financial results, including declining revenues and increased losses, due to its abandonment of its illegal sales and marketing practices.  Indeed, in each of these successive quarters, CSI expressly tied the losses and revenue declines to problems and "challeng[es]" with respect to its sales force, including the sale "optimization" or "transition" which of course only took place in the wake of the drop-off in illegal activity.  For example, on October 7, 2015 alone, the Company announced a revenue decline of more than *9%* from $48.5 million the prior quarter to $43.9 million, which CSI attributed to "challeng[es] with respect to its sales force "transition."  These losses were compounded the following quarter when, on January 21, 2016, CSI announced that its revenues had fallen by an additional $2.5 million.  Thus, in merely two quarters, the Company's revenues fell by nearly *15%*—and the market realized that CSI's revenue stream had been irrevocably damaged by the federal investigation and resulting "chill" on illegal activity.  Based on the declines in revenues that the Company ***in fact*** suffered in the wake of the partial corrective disclosures set

forth below, sales attributable to illegal activities can be estimated to have amounted to approximately **15%** of CSI's total revenues—if not much higher.

16.     Each of CSI's revenue decline announcements resulted in corresponding and significant declines in the price of CSI's common stock—with the April 29, 2015 decline causing the stock to fall approximately 14%, the August 5, 2015 decline causing a 21% drop in stock price, the October 7, 2015 decline causing a price decline of 18% and the January 21, 2016 revenue decline resulting in a precipitous 30% decline in the price of CSI's common stock.

17.     As revelations of Defendants' illegal sales tactics came to light, the Company's common stock price plummeted.  As detailed below in Section IX, *infra*, the price of the Company's shares plunged from a Class Period high of $40.98 per share on April 9, 2015, to $8.74 per share at market close on January 22, 2016, the day after the Class Period, a decline of nearly **80%** and a market capitalization decline of nearly $1 billion.  This lawsuit seeks to recover for the substantial losses suffered by investors.

## II.    <u>JURISDICTION AND VENUE</u>

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 12 U.S.C. § 78aa.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1391(b) because CSI's principal executive

offices are located within this District and many of the acts and transactions alleged

herein, including the preparation and dissemination of materially false and misleading

information, occurred in substantial part in this District.

## III.   PARTIES

### A.   Lead Plaintiffs

21.   Lead Plaintiff Norfolk County Retirement System ("Norfolk County") is a

pension plan headquartered in Canton, Massachusetts, providing retirement benefits for

the public employees of Norfolk County.  As set forth in the certification previously filed

with the Court, Norfolk County purchased shares of CSI common stock during the Class

Period and suffered damages as a result of the federal securities law violations alleged

herein.  By Order dated April 26, 2016, the Court appointed Norfolk County as a Lead

Plaintiff in this action.

22.   Lead Plaintiff Wayne County Employees' Retirement System ("Wayne

County") is a pension plan headquartered in Detroit, Michigan, providing retirement

benefits for the public employees of Wayne County.  As set forth in the certification

previously filed with the Court, Wayne County purchased shares of CSI common stock

during the Class Period and suffered damages as a result of the federal securities law

violations alleged herein.  By Order dated April 26, 2016, the Court appointed Wayne

County as a Lead Plaintiff in this action.

23.   Lead Plaintiff City of Miami Fire Fighters' & Police Officers' Retirement

Trust ("Miami FIPO") is a pension plan headquartered in Miami, Florida, providing

retirement benefits for the fire fighters and police officers of the City of Miami.  As set

forth in the certification previously filed with the Court, Miami FIPO purchased shares of CSI common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.  By Order dated April 26, 2016, the Court appointed Miami FIPO as a Lead Plaintiff in this action.

### B.   Defendants

24.    Defendant CSI develops and manufactures medical devices for the treatment of peripheral and coronary arterial diseases.  CSI is a Delaware corporation with its principal executive offices located at 1225 Old Highway 8 Northwest, St. Paul, Minnesota.  CSI went public on February 25, 2009, after a reverse merger with Replidyne Inc.  During the Class Period, CSI common stock, at all times relevant here, traded under the ticker symbol "CSII" on the NASDAQ Stock Market LLC ("NASDAQ"), which is an efficient market.

25.    Defendant Betterley has been the Company's Chief Financial Officer ("CFO") and an Executive Officer since April 2008.  Prior to joining CSI, Betterley was Chief Financial Officer at Cima NanoTech, Inc. from May 2007 to April 2008, Senior Vice President and Chief Financial Officer of PLATO Learning, Inc. from 2004 to 2007, Senior Vice President and Chief Financial Officer of Diametrics Medical, Inc. from 1996 to 2003, and Chief Financial Officer of Cray Research Inc. from 1994 to 1996.  Betterley was a direct and substantial participant in the fraud.  During the Class Period, as more fully alleged below, Betterley made materially incomplete, false and misleading statements.  Betterley and CSI are referred to together as "Defendants."

## IV.   **RELEVANT NON-PARTY**

26.     David L. Martin ("Martin"), recently deceased, was the Company's President and Chief Executive Officer ("CEO") throughout the Class Period.  Martin had been CSI's President and CEO since February 2007 and a member of the Board of Directors since August 2006.  Martin also served as CSI's Interim CFO from January 2008 to April 2009.  Prior to joining CSI, Martin was Chief Operating Officer of Fox Hollow Technologies, Inc. from January 2004 to February 2006, Executive Vice President of Sales and Marketing of Fox Hollow Technologies, Inc. from January 2003 to January 2004, Vice President of Global Sales and International Operations at CardioVention Inc. from October 2001 to May 2002, Vice President of Global Sales for RITA Medical Systems, Inc. from March 2000 to October 2001, and Director of U.S. Sales, Cardiac Surgery for Guidant Corporation from September 1999 to March 2000.  Martin has also held sales and sales management positions for The Procter & Gamble Company and Boston Scientific Corporation.  Martin was a direct and substantial participant in the fraud.  During the Class Period, as more fully alleged below, Martin made materially incomplete, false and misleading statements.  Martin died on May 1, 2016.

## V.   **FACTUAL ALLEGATIONS**

### A.     **Overview Of The Company And Its Business**

27.     CSI is a manufacturer of medical devices, and describes itself in its SEC filings as "leading the way" in treatments for peripheral and coronary arterial diseases. The Company's PAD Devices, its most important line of products, help physicians treat

the build-up of arterial plaque composed of excess calcium.  CSI's PAD Devices are

FDA-approved to remove this calcium buildup along the walls of target blood vessels by

using an orbital spin to break the buildup down into particles smaller than blood cells.[3]

28.     Throughout the Class Period, CSI candidly acknowledged the singular

importance of PAD Device sales to the Company's business and future prospects, as the

Company derived "substantially all of [its] revenue from the sale of PAD Systems."

Indeed, during the Class Period, CSI's sales of PAD Devices amounted to an average of

***88.26%*** of its total revenues:



29.     On each quarterly earnings call with analysts and other market participants

during the Class Period, CSI touted the amount of its medical device sales for that quarter

and confirmed the percentage of total revenues derived from the sale of its PAD Devices.

---

[3] The standard alternative FDA-recognized procedure is a balloon angioplasty, a
procedure in which a catheter is used to reach the blockage in the artery and a balloon
attached to the catheter is inflated to flatten the blockage.  A balloon angioplasty has a
substantially longer record of safe and effective use, and costs substantially less, than
procedures performed using CSI's PAD Devices.

According to Defendants, sales from PAD Devices were the main driver of the

Company's explosive revenue growth in each year[4] from 2011 to 2015:

| Fiscal Year Ending | Revenues for Device Sales (in millions) | Total CSI Revenue (in millions | Percentage |
|---|---|---|---|
| June 30, 2011 | $69.3 | $78.8 | 88% |
| June 30, 2012 | $73.0 | $82.5 | 88% |
| June 30, 2013 | $91.2 | $103.9 | 88% |
| June 30, 2014 | $120.4 | $136.6 | 88% |
| June 30, 2015 | $161.3 | $181.5 | 89% |

Source: SEC Form 10-K, dated August 27, 2015, at 9, 29.
Source: SEC Form 10-K, dated September 11, 2013, at 12, 31

30.     Buoyed by these strong purported revenue numbers, analysts viewed CSI as

a growth company driven by strong sales of its PAD Devices.  For example, Feltl & Co.,

in a May 3, 2012 report, described CSI as a "rapidly growing medical device company."

Leerink Swann analysts issued a report on April 18, 2013, praising CSI for "its long-term

sales growth profile in the top-tier of the comparable group."  Analysts at Benchmark, in

a March 15, 2013 report, similarly stated that "[w]e believe that CSII has one of the best

revenue growth profiles in the medical device sector."

31.     Throughout the Class Period, CSI touted its own growth as well.  On an

earnings call on October 6, 2011, CEO Martin predicted that CSI "will have double-digit

growth at year-end."  A year later, on the October 30, 2012 earnings call, Martin detailed

CSI's plans "to accelerate and drive our next stage of growth in the PAD market."

---

[4] CSI's fiscal year ends on June 30 of each year and CSI's fiscal Q1, Q2, Q3, and Q4
ends on September 30, December 31, March 31, and June 30, respectively.

Nearly a year after that, on the August 7, 2013 earnings call, Martin again assured investors that "[w]e feel confident about our growth potential going forward."

### B.   The Anti-Kickback Statute Prohibits The Giving Of "Anything Of Value" In Order To Induce Purchases Of A Company's Products

32.    As far as investors knew, CSI had legitimate reasons to project strong growth, because its strong sales figures for its core products were achieved in an industry governed by regulations that, among other things, strictly prohibited the giving of kickbacks to and the coordination of other *quid pro quo* arrangements with medical professionals.

33.    This legal regime was strict but straightforward.  The federal Anti-Kickback Statute or AKS prohibits sellers of devices to give remuneration with the intent of inducing orders.  42 U.S.C. § 1320a-7b(b).  In particular, the AKS states, under the heading "Illegal Remunerations," that:

> Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2)(B).

34.    The Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has determined that a "remuneration" is "virtually anything of value." OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed. Reg.

14245, 14252 (Mar. 24, 2003).  Under the AKS, kickbacks include remunerations provided to induce or reward physicians' prescriptions or use of a company's products or referrals that would lead to such prescriptions or use.  Such kickbacks lead to increases in expenses for government-funded health benefit programs by incentivizing medically unnecessary treatments and excessive reimbursements.  They also unfairly reduce a patient's healthcare choices, as physicians may prescribe treatments based on the physician's own financial interests rather than according to the patient's medical needs.

35.     As discussed further below, CSI was aware that much of a cardio-interventionist or cardiovascular surgeon's clientele comes from referrals by other healthcare providers, such as podiatrists, nephrologists, wound care centers, home care nurses, dialysis techs, family-care doctors, orthopedic clinics, diabetes nurses, and senior citizen support organizations.  As such, CSI knew that referrals from these healthcare providers constituted something "of value" to users of CSI's devices.  This is exactly what CSI intended to exploit in its illegal referral marketing plans, which offered *quid pro quo* referral marketing arrangements with physicians in return for purchasing CSI's product.  Indeed, in at least one instance, CSI even promised a customer that it would hire referral marketers to market for that customer alone in exchange for the customer's continued purchases of CSI devices.

36.     A violation of the AKS also constitutes a violation of the Federal False Claims Act ("FCA"), when claims submitted to the federal government for reimbursement include medical products that were prescribed or purchased as a result of violations of the AKS. 42 U.S.C. § 1320a-7b(g).

**C.     CSI's Systemic Use Of And Reliance On
           Illegal Sales Practices To Improperly Boost Sales**

37.     Throughout the Class Period, CSI sales territories throughout the country

employed the *quid pro quo* referral marketing sales pitch to induce customers to purchase

CSI products.  The purpose and effect of CSI's illegal sales tactics was to increase sales

of its devices, creating the false impression that the sales of the PAD Devices, and by

extension, the Company's revenues and overall financial prospects, were growing, stable,

and sustainable.  Numerous sources, including former CSI employees located in different

sales territories throughout the United States, internal Company documents attached to

submissions in the related Babyak Action, as well as CSI's Corporate Integrity

Agreement with the government, reveal that CSI's sales force was encouraged to and did

rely on *quid pro quo* referral marketing in order to induce purchases of CSI's PAD

Devices.

**1.     Evidence Submitted In The *Babyak*
           Action Confirms CSI's Improper *Quid Pro
           Quo* Referral Marketing in Violation of the AKS**

38.     Details of CSI's improper referral marketing practices were revealed as part

of a whistleblower retaliation and wrongful termination lawsuit brought against the

Company by Steven Babyak.  Mr. Babyak worked at CSI from October 1, 2012 to June 1,

2015, most recently as a Regional Sales Manager in California.  A Regional Sales

Manager oversees a team of roughly 7 to 11 sales representatives, known as District Sales

Managers.  A Regional Sales Manager, and his or her team of District Sales Managers, is

assigned to particular regions of the United States for purposes of selling CSI's PAD

Devices.  Roughly five Regional Sales Managers reported to one of three Area Sales

Directors at CSI, all of whom reported to Jim Breidenstein, the former Vice President of

Sales.  Mr. Breidenstein, in turn, reported directly to CEO Martin.

39.     Internal CSI documents publicly filed in connection with the Babyak

Action confirm details of one version of CSI's *quid pro quo* referral marketing scheme—

referred to as the "Triangle Offense" program.  This illegal sales tactic was deliberatively

implemented by one of CSI's three Area Sales Directors across his entire sales region.

These documents also reveal that Babyak and members of his sales team raised concerns

about this sales tactic as a violation of the AKS.  The materials, which include internal

CSI documents, were all part of the record in the Babyak Action, and were included as

exhibits to declarations.

40.     For example, one such document is a February 19, 2015 Complaint of

Retaliation sent by Mr. Babyak to CSI's Human Resources ("HR") and Legal

Departments, specifically to CSI in-house counsel, Alexander Rosenstein (the "February

Complaint of Retaliation").  This document begins: "I feel that I am being retaliated

against for bringing patient safety and FDA policy concerns to the attention of upper

management, and backing my sales reps for doing so."  Ex. 1 at SB000094.  The

February Complaint of Retaliation was included as an exhibit to a declaration of Steven

Babyak, which was filed in the Babyak Action on January 3, 2017.

41.     Less than a month later, on March 10, 2015, Babyak sent another complaint

to CSI's HR and Legal Departments, specifically to CSI in-house counsel, Alexander

Rosenstein (the "March Complaint of Retaliation") that reiterated the same concerns that

were detailed in the February Complaint of Retaliation.  The March Complaint of

Retaliation was included as an exhibit to a declaration of Steven Babyak, which was filed

in the Babyak Action on January 3, 2017.  The March Complaint of Retaliation also

included additional details of illegal conduct witnessed by Mr. Babyak, which he even

expressly flagged "may be illegal."  For example, the March Complaint of Retaliation

stated: "It has been brought to my attention that sales and marketing activities that we are

being mandated to do may be illegal.  The concerns are specific to the Anti-Kickback

Law and the Sunshine Act."  Ex. 1 at CSI003741.

42.     For example, the March Complaint of Retaliation provided details of a CSI

sales tactic referred to as the "Triangle Offense" program, stating:

> Several employees expressed a deep concern regarding a
> program that was created by Todd Goldberg, Area Sales
> Director, called the **Triangle Offense**.  Todd Goldberg's
> Triangle Offense is **a referral marketing program** that builds
> on a previous CSI program - Five Steps to a Calcium
> Partnership.  **The Triangle Offense is a sales and marketing
> program designed to drive patient referrals from referring
> physicians to our loyal customers**.  My exposure to Todd's
> Triangle Offense started prior to his taking over as the Area
> Sales Director.  He reached out to me on May 23, 2014 and
> during our conversation he explained the concept of his
> Triangle Offense.  He emphasized that this program would
> drive sales growth by driving referrals to our loyal customers.
> **He said the Triangle Offense gives you control.  If you own
> the bottom base of the triangle (referring physicians,) you
> will control the top point of the triangle (physician end
> user).  If the physician end user isn't a loyalist then we can
> steer referrals to someone that is loyal because we control
> the referral spigot**.

*Id.* This document also notes that "[a]t our National Sales Meeting July 24-27, Todd [Goldberg] made the rounds speaking to many of our sales reps one on one about the ***Triangle Offense***." *Id.* at CSI003742.

43.     Babyak explained in the March Complaint of Retaliation that the Triangle Offense program "was similar to the CSI Account Plan & Review that Jim Breidenstein had sent on November 3, 2013 and similar to the Fives steps to a Calcium Partnership." *Id.* As discussed further below, Jim Breidenstein, the former Senior Vice President of Sales at CSI who was fired as a part of the Company's sales restructuring in the wake of the DOJ investigation and *Qui Tam* Action, was hired by former CEO Martin, and reported directly to CEO Martin and CFO Betterley. Also, CEO Martin and CFO Betterley repeatedly touted the role of Breidenstein in building CSI's sales force during the Class Period.

44.     The March Complaint of Retaliation provides further details about the Triangle Offense program, noting:

> At my Regional Meeting on Oct. 24th Todd asked everyone in the room: What percentage of your time do you spend in cases? The answers ranged from 70%-80%. ***Todd then mandated that it should be 40% and the remainder of the time should be spent marketing for our physicians. He then went into his Triangle Offense overview of driving referrals to your loyal physicians***. The comments from the group came back that if we are not in the case with the doctors the Doctor might not spin (use our device) or if a competitive rep (Covidien, Spectranetics, Boston Scientific) is in the case they might use competition. Todd's reply back was: "You need to have a partnership with your doctor. Let them know that your time is better spent marketing for them and getting referrals. ***Get an agreement that you will market for them as long as he uses our device***. He then went into describing that

> you can turn the spigot on and you can also turn it off. ***If the doctor is not loyal to us you turn the spigot off and send your referrals to a loyal user***"

***

> Todd's Triangle Offense continues to be a mandate and is one of the areas we are to check with our reps every Monday on our one on one calls.

*Id.* The admonitions to "[g]et an agreement that you will market for [doctors] as long as [they] use[] our device" and to "turn the spigot off" for disloyal doctors illustrate the illegal nature of the Triangle Offense program, as they confirm that the referrals were knowingly and expressly designed to induce sales of PAD devices.

45.      Additionally, the March Complaint of Retaliation detailed how sales staff on Babyak's team were concerned that the Triangle Offense was illegal:

> ***One of my sales reps, Moe Heise feels adamant that Todd's Triangle Offense is a violation of FDA policy and very possibly a violation of the Sunshine Act***.  Several vendors (Biotronik Sales Rep and Covidien Sales Rep) have spoken to her loyal physician customers and complained that ***the marketing that CSI does is illegal***.

> ***Moe Heise now strongly feels that the Triangle Offense is illegal***.  She mentions that her time is worth money and that ***all the hours she has spent marketing for her top physician group is illegal***.  In addition Todd emphasizes organizing dinners and lunches where we gather a group of referring physicians (Bottom Base of the Triangle) and have a designated loyalist market their practice to them with CSI picking up the cost of meals.  A comment that really stands out with her and others is when Todd said to a group of Sales Reps: "You need to control the referring physicians. You should get to the point where a referring physician calls you (CSI Rep) and asks who to send the patient to."

> ***Brenna Clay spoke to another CSI Sales Rep about Todd's Triangle Offense. They both feel it's illegal***.  The Sales Rep

- 22 -

> made the comment: "I should forward the emails he sends out
> to HR and get him fired."
>
> Lisa Saffer told me that at the Dallas Sales Meeting on
> January 14, 2015, Todd spoke with her about getting with Dr.
> Mendoza and partnering with him.  He instructed her that the
> way to do this was to let Dr. Mendoza know that rather than
> being in his cases that you will market his practice to drive
> referrals to him.  Later at the same meeting Todd told me
> about the conversation and said when you are in town next
> week with Lisa, get Dr. Mendoza to dinner.  Have Lisa
> present to him that we can drive referrals to him and close
> him that her time is better spent out marketing for him than
> being in his cases.  Dr. Mendoza was not available for dinner.
> Lisa discussed Todd's comments with her husband and feels
> that his direction was illegal.

Ex. 1 at CSI003742-43.

46.    CSI purportedly conducted an internal investigation into the issues Babyak

raised, whitewashing the misconduct with claims that there was no evidence of retaliation

against Babyak.  CSI's memorandum detailing the internal investigation was filed

publicly in the Babyak Action.  The memo includes notes of interviews of CSI

employees, including Babyak, which reveal additional details of improper referral

marketing practices.  Ex. 2.

47.    For example, notes of a March 13, 2015 interview with Babyak detail

Babyak's concerns about the Triangle Offense program, which he described during the

interview as follows:

> The top point of the triangle are your "loyalist"/key
> user/target physician or group.  Maybe 3 doctors working at a
> hospital.  Look, doc, I can be more valuable to you outside
> your case than in the case.  If I can be outside of the case, I
> can be out marketing for you.  The bottom of the triangle is
> the wound care center, podiatrist, or other referring

physicians, get the names from the doctor, then get those referrals.  When a referring physician calls you/the sales person, then the triangle is working.  ***Further, if your target doctor doesn't use our device, then you can redirect the referring physicians to a doctor that will use you***.  You can have a lunch with the doctor and establish the relationship— that's the relationship and we pay for lunch.  The reps set these up.  The attendees are the rep, the doctor and referring physicians and ancillary staff.

*Id.* at CSI000145.

48.     The Company's memorandum of the investigation also included notes of a

March 13, 2015 interview with Moe Heise, who described the Triangle Offense program

as follows:

My role is to meet with a podiatrist and other referring physicians, then connect them with the physician.  I'd connect "group one" and have them funnel their patients to my physician.  ***If the physician doesn't use our device, then I should drive the referrals and business to a different physician that will use your device***.  Additionally, if a physician learned that I did this, I would lose my credibility and business.

\*\*\*

I worked with a rep in endocrinology on PAD awareness. Then Todd wants me to connect physicians from the cardiology group to meet with the endo physicians and I brought them together.  The endo practice will not accept lunches so that did not happen.  CSI is paying for these events, not the physician.  ***It's on my expense reports, listed as PAD awareness marketing***.  It is not joint marketing because the physician isn't paying for anything.  ***Primary care physician is #1 on the triangle, the cardiologist is on another corner and the podiatrist is the third corner***.

*Id.* at CSI000147.

49.     Likewise, the Company's memorandum of the investigation includes notes of a March 16, 2015 interview with Brenna Clay, who described the Triangle Offense program as follows:

> I heard about it from Todd at a meeting. We need to control the referral market. ***We go out and do dinners or lunches to somehow control the referral market by advertising for a physician and if the physician doesn't use our device, then we move the referrals to a physician that will.***  I've only heard it from Todd, not others at CSI. ***He also used to use an icon with a faucet, to depict to the reps that we turn the referrals on and off.***  He also asked us to spend 60% of our time referral marketing for our physicians and only 40% in cases—he presented this in meetings with everyone.

*Id.* at CSI000149.

50.     Internal CSI documents further confirm the existence of Triangle Offense Program at CSI.  For example, after receiving complaints and investigating internally, CSI sent Goldberg a warning letter on April 30, 2015 rebuking him for the "Triangle Offense" program, as well as fostering a culture of "intimidate[ion]" and "fear."  *See* Ex. 3 at CSI010396.  (April 30, 2015 warning letter was attached as an exhibit to a declaration of Babyak's attorney, Tamara S. Freeze, filed on January 25, 2017 in the Babyak Action, indicating that the document was produced to Babyak in discovery by defendant CSI).  As discussed further below, this written warning was sent in the post-May 9, 2014 period, when CSI was seeking to curb its illegal activities in the wake of the DOJ's investigation and intervention in the *Qui Tam* Action.

51.     Babyak's verified interrogatory responses filed in the Babyak Action likewise refer to the "Triangle Offense" program, noting that "[o]n or about March 10,

2015, [Babyak] requested investigation and clarification of the Triangle Offense from

CSI Human Resources and legal department." Ex. 4 at 5. The same interrogatory

response continued:

> On or about March 13, 2015, [Babyak's] team member, Moe Heise, complained to Human resources . . . that she has been retaliated [against] for her patient safety concerns and ***complaints about Triangle Offense***.
>
> ***
>
> On or about March 27, 2015, [Babyak] sent another letter of complaint . . . ***stating that his patient safety concerns and [complaints about the] Triangle Offense are not being taken seriously and that he would be filing a complaint with the FDA***.

*Id.* at 5-6.

52.     On April 22, 2015, Jim Breidenstein sent an e-mail to Laura Gillund, CSI's

head of human resources, and Alexander Rosenstein, CSI's General Counsel that also

refers to the Triangle Offense program. The e-mail, attaching a document called "Q4

Babyak Plan," stated, "see Babyak Plan … he mentions ***Triangle offense*** again … why

does he keep doing this? ***I told him to stop last week***." The e-mail, without its

attachments, was submitted as an exhibit to a declaration of Babyak's attorney, Tamara S.

Freeze, filed on February 6, 2017 in the Babyak Action. Ex. 5 at CSI008878.

53.     On April 24, 2017, a California jury awarded Babyak $2.7 million in

compensatory damages and, on April 25, 2017, found that CSI would also have to pay

$22.4 million in punitive damages in the Babyak Action.

54.     The jury found that Babyak was the victim of retaliation for raising

concerns about, among other things, the legality of the Triangle Offense program. As

detailed below, Lead Plaintiffs' independent investigation further confirmed the use of the Triangle Offense Program and similar illegal referral marketing programs across the Company.

### 2.   Former CSI Sales Representatives Have Confirmed CSI's Improper *Quid Pro Quo* Referral Marketing in Violation of the AKS

55.     Former CSI sales representatives also confirmed that CSI relied extensively on illegal *quid quo pro* referral marketing to induce purchases of CSI products.  These former employees worked for CSI in Los Angeles and Arizona, demonstrating that the practices they described were widespread and, therefore, the product of coordination from the very top executives of CSI.  According to these former employees, CSI orchestrated this illicit kickback program by instructing its sales representatives to market cardiologists and vascular surgeons who were CSI customers to neighboring physicians and healthcare providers.  In exchange, these cardiologists and vascular surgeons agreed to purchase CSI products.  This referral-based marketing was a blatant kickback program in violation of the AKS, as it was intended and designed to reward physicians who would use CSI devices in return for practice building.

56.     The former employees were District Sales Managers of CSI, who worked in different regions in the United States.  These District Sales Managers confirmed that they were sales representatives of the Company, tasked with selling CSI's PAD Devices, and that their job responsibilities were the same, regardless of the region in which they worked.  As discussed above, each region had between 7-11 District Sales Managers, who all reported to one Regional Sales Manager.  Roughly five regional sales managers

reported to one Area Sales Director, and there were a total of three Area Sales Directors

at CSI, all of whom reported to Jim Breidenstein, the former Vice President of Sales.  Jim

Breidenstein reported to Martin and Betterley.

### a)      Greater Los Angeles Sales Territory

57.      A former District Sales Manager for the Greater Los Angeles region (the

"L.A. DSM"), who worked for CSI from early September 2014 until April 2016, also

confirmed that CSI relied on an illegal referring marketing program known as the

"Triangle Offense."  The former L.A. DSM worked in the same territory as Babyak and

corroborated the allegations in the Babyak Action.

58.      The L.A. DSM reported that, when he was being interviewed in August

2014 for his job at CSI, Goldberg, the Area Sales Director covering the region, explained

the Triangle Offense Program to him.  The interview, which took place at the Beverly

Hilton hotel, was one of seven interviews the former L.A. DSM had with CSI, three of

which were with Goldberg.

59.      During the interview at the Beverly Hilton, Goldberg explained the

Triangle Offense program by drawing a triangle on a napkin to illustrate how the program

worked.  The lower left corner of the triangle represented the CSI sales representative, the

bottom right corner was a physician (such as a podiatrist) and the top of the triangle was

the physician.  Goldberg explained to the former L.A. DSM that the CSI sales

representative was to control the bottom right angle of the triangle, *i.e.*, the podiatrist.  If

that particular podiatrist was not referring to the doctor at the top of the triangle, the sales

representative was supposed to "flip" the triangle over so that the top of the triangle

would now be at the bottom, representing a doctor that uses CSI devices.  Goldberg told the former L.A. DSM that by owning the bottom base of the triangle (*i.e.*, the referring physician), the sales representative controlled the top point of the triangle (the physician user end) and, if the physician at the top of the triangle was not loyal to CSI products, the sales representative could then steer referrals to customers that were loyal.  This description of the Triangle Offense program corroborates the description of the program detailed in the documentary evidence from the Babyak Action, as alleged above, *see* Section V.C.1., *supra*.

60.     According to the former L.A. DSM, Goldberg regularly promoted the Triangle Offense program when interviewing sales representatives and gauged how they accepted the program.  The former L.A. DSM never participated in the Triangle Offense program because he believed it was illegal, but explained that CSI targeted third-party physicians, particularly wound-care specialists, for referrals to physicians that used CSI's PAD Devices.  The former L.A. DSM explained that he was certain that other sales representatives directed wound care specialists to refer to CSI physicians.

**b)     Arizona Sales Territory**

61.     A former District Sales Manager for Arizona (the "Arizona DSM"), who worked at CSI from early 2008 to early 2013 selling PAD devices directly to hospitals, confirmed CSI's referral-marketing practices and explained that many of these practices were brought over from Fox Hollow Technologies, Inc., where the former Arizona DSM had previously worked before joining CSI.  The former Arizona DSM explained that he would do referral marketing for CSI's big customers because "you wouldn't want to

waste your time doing it for someone who was not going to use your product." The former Arizona DSM explained that the best way to referral market was to have the physician go to a podiatrist's office, or get three to four podiatrists out to a dinner with the physician.

62.    When asked whether the arrangement was an explicit *quid pro quo* between CSI and the physicians CSI marketed for, the Arizona DSM stated that while CSI sales staff tried to not be so "ham-handed" by being too explicit, each of the physicians CSI referral marketed for was made to understand that they were expected to purchase CSI product in return for the marketing, and that the marketing would cease should they stop purchasing CSI devices. The Arizona DSM also explained that these referrals were valuable to the physicians, who mostly worked in hospitals, because they were paid on a per-procedure basis. Furthermore, the Arizona DSM explained that the physicians had little qualms selecting CSI's device in exchange for CSI's referral marketing because it was the hospitals they worked for that would ultimately pay for the devices, while the physicians themselves reaped the benefits of performing incremental procedures generated by CSI's referral marketing.

63.    The former Arizona DSM would also go to the offices of podiatrists and primary-care physicians and bring business cards of the CSI customer-physician, as well as referral sheets that could easily be faxed to the physician's office. The referral sheets were used as flyers, and sales representatives would get copies of them printed and bound at a Kinkos, and then leave them at the podiatrist's office so that patients could easily be referred.

### 3.   CSI's Improper Referrals Are Confirmed By Facts Alleged In The *Qui Tam* Complaint

64.     On July 15, 2013, the CSI Whistleblower (*i.e.*, Travis Thams), a former CSI District Sales Manager in Washington, brought suit pursuant to provisions of the Federal False Claims Act, alleging that between at least 2010 and the filing of the *Qui Tam* Action, CSI instituted a Company-wide effort to maximize its profits through various illegal sales tactics and violations of laws and regulations.

65.     In particular, the *Qui Tam* Complaint stated that CSI engaged in practices that were "designed to and did influence doctors and other medical personnel to use CSI's medical devices," including:

> ***referral channel marketing***, though which CSI would target third-party physicians to refer patients to physicians who would use CSI devices in return for these referrals . . . .

*See Qui Tam* Complaint, at 7.

66.     The *Qui Tam* Complaint likewise explained the rationale behind the such "referral channel marketing," stating that:

> CSI orchestrated this scheme by instructing its sales representatives to make sales calls to physicians and other health care providers who do not use CSI products — like podiatrists, nephrologists, wound care centers, home care nurses, dialysis techs, family-care doctors, orthopedic clinics, diabetes nurses, and senior citizen support organizations — ***but who could refer their patients to the cardiologists and vascular surgeons who do use CSI PAD devices***. Once CSI sales representatives arranged these referrals, ***they effectively captured the business of the cardiologists and vascular surgeons, who became dependent on the CSI sales representatives for new patients***.

*Id*. at ¶74.

- 31 -

67.     Likewise confirming CSI's improper referral marketing practices, the *Qui Tam* Complaint cited an e-mail from a CSI sales representative, Gary Hall, boasting about the ease in which he engaged in these illegal tactics, stating:

> "I need Pod[iatrists] to refer cases so I get cases. . . . [One podiatrist] basically has 4 reads for Monday that he is willing to give to one of my Docs" — i.e., cardiologists and vascular surgeons. "In one week I got 1 new Pod for 8 cases per month and now this ***new Pod has 4 reads and patients to funnel to my Doc. I don't want to say its [sic] like shooting fish in a barrel . . . but it kinda is***."

*Id.*

68.     In early 2014, several months after the filing of the *Qui Tam* Action, the DOJ decided to intervene on behalf of the U.S. government in the *Qui Tam* Action.  On May 8, 2014, the USAO informed CSI that it was being investigated for the allegations laid out in the *Qui Tam* Action, and served CSI with a Civil Investigative Demand.

### 4.     CSI's Settlement with the DOJ and its Corporate Integrity Agreement Confirm CSI's Improper *Quid Pro Quo* Referral Marketing in Violation of the AKS

69.     On June 28, 2016, after two years of investigation conducted by the DOJ, CSI reached a settlement with the government.  Ex. 6.  As set forth in the settlement agreement, "[t]he United States contend[ed] that CSI caused claims to be submitted to the Medicare program . . . in violation of the False Claims Act."  *Id.* at 1.  In addition, CSI settled the DOJ's express claim that "during the period from January 1, 2010 through [June 28, 2016]: CSI knowingly and willfully offered or paid remuneration to physicians who use CSI's products . . . in the ***form of marketing arrangements and practice development activities conducted on behalf of [such physicians] in a manner intended***

*to induce [them] to use CSI's products in violation of the federal Anti-Kickback Statute*." *Id.* at 2.

70.     In connection with the settlement, CSI paid $8 million in fines and entered into a Corporate Integrity Agreement ("CIA") to ensure the cessation of the activities alleged in the settlement agreement.  Significantly, the CIA focused on CSI's conduct of "Co-Marketing Activit[ies]," which the CIA defined as "any marketing or other promotional activity that CSI performs with or on behalf of (in addition to itself) one or more HCPs or HCIs involving a Government Reimbursed Product." Ex. 7 at 3.

71.     With respect to these Co-Marketing Activities, the CIA required the establishment of processes to "to ensure that a needs assessment has been completed for any Co-Marketing Activities, prior to engaging in such Co-Marketing Activities." *Id*. at 14-15.  Among other processes, the CIA also obliged CSI to conduct "Field Force Monitoring and Review Efforts," to "evaluate and monitor its field sales personnel's interactions with Health Care Professionals (HCPs) and Health Care Institutions (HCIs)." *Id*. at 15.  These efforts would consist of "a formalized process designed to directly and indirectly observe the appropriateness of sales personnel's interactions with HCPs and HCIs and to identify improper conduct.  [They] shall include: (1) direct field observations of sales personnel; and (2) the monitoring and review of other records relating to sales personnel's interactions with HCPs and HCIs (Records Reviews)." *Id*.  The records reviews required the "monitoring and review" of "records and systems associated with field sales representatives' interactions with HCPs (including records relating to Co-

Marketing Activities, consulting arrangements…[and] any payments to HCPs…)."
*Id.* at 16.

72.     As alleged herein, Defendants' illegal sales tactics were used to artificially inflate revenues from the PAD devices—products that provided CSI with more than ***88%*** of its revenues.

## VI.     ADDITIONAL SCIENTER ALLEGATIONS

73.     As alleged herein, Defendants knew or recklessly disregarded that the public documents and statements they issued and disseminated throughout the Class Period were materially false and misleading and they knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements. Defendants, by virtue of their receipt and knowledge of, or unfettered access to, information reflecting the true facts regarding CSI's illegal sales practices regarding PAD Devices, their control over, and/or receipt and/or modification of CSI's materially incomplete, false and misleading misstatements and/or their access to inside information concerning CSI and its illegal sales practices for PAD Devices, knowingly or recklessly participated in the fraudulent course of conduct alleged herein.  Indeed, the fraudulent scheme described in this Complaint could not have been perpetuated over such a substantial period of time or over such diverse geographic locations without the knowledge and complicity, or at minimum reckless disregard, of the personnel at the highest level of the Company, including CFO Betterley and CEO Martin.

A.     **The Nature Of The Alleged Illegality As Well As Defendants' Own
Statements And Actions Contribute To A Strong Inference Of Scienter**

74.     Martin and Betterley were deeply involved in CSI's daily operations and

had access to all material information regarding the Company's core operations,

including such critical products as the PAD Devices.  As such, they had knowledge of all

material facts regarding CSI's core PAD Device sales business—or at the very least had

full and unfettered access to this same information.  Martin and Betterley therefore knew

or were severely reckless in disregarding the fact that adverse facts specified herein had

not been disclosed to, and were being concealed from (in order to mislead), the investing

public.

75.     Further, as noted above, the sale of CSI's PAD Devices generates

"substantially all" of the Company's revenue—accounting for an average of more than

*88%* of the Company's revenues during the Class Period.  Given the crucial importance

of PAD Device sales to CSI's operational and financial success, the sales figures and the

illegal and illicit methods employed to achieve those sales were among CSI's most

important internal metrics, a subject of intense market scrutiny and concern, and a topic

on which Defendants made numerous public statements throughout the Class Period.  As

such, Martin and Betterley were plainly aware of the means by which the Company's

core products were sold—namely, through illegal kickbacks, such as entering into *quid*

*pro quo* arrangements with physician-customers by offering to generate patient referrals

for these customers in exchange for their purchases of CSI products.  Indeed, as CFO,

Defendant Betterley was specifically responsible for monitoring and understanding how

CSI generated revenues from its core products—*i.e.,* the PAD Devices—and therefore

knew or was reckless as to the fact that CSI did it through such illegal sales tactics.

76.     According to the deposition testimony of Richard Roberts, formerly an

Area Sales Director at CSI from May 2011 to January 2016, submitted in the Babyak

Action, Martin's management of CSI's sales practices was so hands-on, that he

sometimes personally approved sales quotas for District Sales Managers.  As stated in the

filed deposition testimony:

> Q: And who did you speak to when you were setting quotas,
> meaning did you run it by the Area Manager or did you run it
> by Jim Breidenstein.
>
> A. So when I said quotas, yeah, you would speak with
> everybody involved. So the managers, Jim Breidenstein, and
> then final approval would go sometimes up to Dave Martin.
>
> Ex. 8 at 44.

77.     On multiple calls with investors and analysts, Martin and Betterley

repeatedly discussed CSI's sales management team and, in particular, two key figures at

the heart of CSI's fraud:  Executive Vice President of Sales & Marketing Kevin Kenny

(currently the Company's COO) and Senior Vice President of Sales Jim Breidenstein,

who was fired as a part of the Company's sales restructuring in the wake of the DOJ

investigation and *Qui Tam* Action.  Moreover, Martin and Betterley specifically tied the

hiring of these individuals to the Company's growth prospects.  To cite just a few

examples:

78.     For example, on an October 6, 2011 analyst call, Martin trumpeted the

recent hiring of Kevin Kenny, stating that his addition meant "many upgrades to our

Sales and Marketing organization and our programs are in progress[],” that “[t]hese initiatives include management and professional staff additions and changes, upgrades in customer programs, *including physician education and training*.” He added, “[t]hese changes are necessary to build the *foundation for higher growth* in the future but are disruptive initially,” and assured investors that Kenny had “more than 20 years of medical device industry experience,” and possessed “the management skills to bring out the best in our sales staff.” Responding to analysts’ questions, he stated, “Kevin brings in his systems and process and get—puts us in a position to scale over the coming years,” and “Kevin Kenny is an individual that, quite frankly, we just couldn’t have afforded a year ago, but we’ve got him now as an investment.” Confidently, Martin predicted with amazing prescience that with Kevin on board, “*we will have double-digit growth at year-end*.”

79.     On a November 2, 2011 analyst call, Martin praised the work his new hire has done in the five months since he joined the company. In response to an analyst’s question over whether the company would hire more top executives, Martin stated, “We’re done. Kevin’s done a great job. He’s really reformulated management, programs, process. He’s professionalizing this commercial organization. And it’s a nice add. We’ve got key company assets in our Stealth technology, in our scientific build, in our coronary franchise that’s on the up and come. Quality and regulatory has always been an earmark of this organization. And we have really controlled expenses on the back of our commercial team, but now in light of some of the other strengths including technology and science it is time to position our commercial organization for scale. So

the investment in Kevin and in the new management, in the new processes, in the new

medical education, it is ***going to show in the forward quarters and another indicator for***

***second half fiscal growth***."

80.     On the May 2, 2012, Q3 2012 earnings call, Martin again touted Kenny's

experience, as well as the addition earlier that year of Jim Breidenstein, stating, "[i]n

January we brought on Jim Breidenstein as VP of Sales who had five years at Kyphon

and success with growth and making that procedure mainstream."  According to CSI's

interrogatory responses filed in the Babyak Action, Jim Breidenstein "managed [CSI's]

entire sales department and oversaw cross-functional projects relating to sales.  All area

sales directors, regional sales directors, sales representatives, sales operations personnel,

and sales training personnel directly or indirectly reported to him."  Ex. 9 at 4.

81.     On an October 30, 2012 analyst call, in response to an analyst's questions

about how the Company's forthcoming quarter guidance trumped had expectations by so

much, Martin stated, "Yes, we are driving utilization rates up in all of our targeted

account bases—top 50, top 200 office-based labs. . . .  The second thing that's working is

management.  We've invested in new management.  ***Kevin Kenny and Jim Breidenstein***

***come with great experience, experience to scale, they're here to scale, and they're***

***really activating the most important resource in the Company—people***.  And then the

third thing is, we've invested in medical education and we've really made great strides

there.  We're doing some really neat things for the physician operator."

82.     On a January 30, 2013 analyst call, in response to an analyst's questions

regarding enhancements to sales and marketing, Martin again praised the systems that

Kenny and Breidenstein had installed since their entry into the Company, stating that these systems were "enhancements really—we installed new management starting with Kevin Kenny about a year-and-a-half ago.  And then, he's put in systems and process for management training and field sales training and every specific aspect of what we need to do in the adoption curve.  Medical education has been a big hit, that was new."

83.     On an August 6, 2014 analyst call, Martin affirmatively praised Kenny and Breidenstein in his preliminary remarks, stating, "after reporting a particularly strong revenue quarter and year, I need to recognize our commercial organization, led by Executive Vice President Kevin Kenny, Senior Vice President Jim Breidenstein, and Marketing Vice President David Veino. Under their direction and that of their peers and the team at our Texas and Minnesota headquarters, CSI has developed and recruited a best-in-class group of commercial professionals."

84.     These two individuals, Kevin Kenny and Jim Breidenstein, who were directly responsible for sales at CSI and reported to the CEO, were identified in the *Qui Tam* Action as being key orchestrators of CSI's scheme to illegal kickbacks and other illicit tactics to drive sales.  *See Qui Tam* Action ¶¶ 54, 55, 65.  Moreover, internal CSI documents filed in the Babyak Action, *see* Section V.C.1., *supra*, reveal that Todd Goldberg's Triangle Offense program was modeled on an early referral program that Jim Breidenstein implemented at CSI.  Indeed, Babyak's March Complaint of Retaliation explained that the Triangle Offense program "was similar to the CSI Account Plan & Review that Jim Breidenstein had sent on November 3, 2013 and similar to the Five steps to a Calcium Partnership." Ex. 1 at CSI003742.  Todd Goldberg, who explained the

Triangle Offense program to Babyak and other CSI employees, reported directly to Jim Breidenstein, who reported to Martin and Betterley.  Further, multiple documents from the Babyak Action confirm that Jim Breidenstein was made aware of the illegal referral marketing program known as the "Triangle Offense."

85.     Defendants touted the work of both Kenny and Breidenstein, emphasizing they had been brought on by, worked closely with, and were in direct communication with the CEO, all while neglecting to inform CSI's investors that they were implementing an utterly unsustainable and in fact, illegal sales strategy which, if ever revealed, would tank the Company's stock price.

**B.     Suspicious Stock Sales By CEO Martin and CFO Betterley During The Class Period Contributes To A Strong Inference Of Scienter**

86.     Both Martin and Betterley engaged in stock sales during the Class Period that were suspiciously timed and dramatically out of line with their prior trading practices.  As a result of these Class Period trades, Martin and Betterley profited from the artificial inflation embedded in the trading price of CSI stock caused by their false and misleading statements and omissions to investors during the Class Period.  The Class Period sales of CSI stock by Martin and Betterley were highly unusual and suspicious as measured by (i) the total amount and percentage of shares sold, (ii) the contrast with Martin and Betterley's own prior trading history, and (iii) the timing of the sales.  Martin and Betterley's sales therefore raise a strong inference of scienter.

87.     To evaluate Martin's and Betterley's selling activity, Plaintiffs used the publicly-available trading data that Martin and Betterley reported to the SEC on Form 4.

Plaintiffs analyzed the trading by Martin and Betterley during the Class Period and then compared that to the over two-year period immediately preceding the Class Period beginning on May 25, 2009 and ending September 11, 2011 (the "Control Period").

88.     To analyze Martin and Betterley's stock sales, Plaintiffs calculated the total sales by each, together with the cash proceeds from such sales, during the Control and Class Periods.  Those totals were then compared.  Martin and Betterley's specific trading dates were also evaluated compared to Corrective Disclosure dates.  All of these analyses reveal that Martin and Betterley's Class Period sales were extremely large, highly unusual, and suspicious.

89.     The number of shares sold and the net proceeds from such sales during the Class Period by Martin and Betterley were extraordinarily large compared to the Control Period.

| Person | Control Period | | Class Period | |
|---|---|---|---|---|
| | Number of Shares Sold | Net Proceeds | Number of Shares Sold | Net Proceeds |
| Martin[5,6] | 89,709 | $974,935 | 666,903 | $17,672,752 |
| Betterley[7] | 20,626 | $221,745 | 147,781 | $3,931,772 |
| Totals | 110,335 | $1,196,680 | 814,684 | $21,604,524 |

---

[5] Excludes a May 30, 2013 withholding of 25,099 shares used to satisfy taxes or exercise price payment.

[6] Trading prices rounded from Form 4s to the nearest one-hundredth.

[7] Trading prices rounded from Form 4s to the nearest one-hundredth.

90.     Martin and Betterley's Class Period stock sales were not only large in absolute terms, but also inconsistent with Martin and Betterley's own prior selling activity during the Control Period.

91.     Collectively, Martin and Betterley increased their stock sales from 110,335 shares during the Control Period to 814,684 shares during the Class Period—a startling increase of ***more than 700%***.  Taken individually, Martin and Betterley's sales both increased sharply.  During the Class Period, Martin increased his sales six-fold from 89,709 to 666,903 shares.  Betterley's sold share volume also increased significantly, from 20,626 shares sold during the Control Period to over 147,781 during the Class Period.

92.     The contrast between Martin and Betterley's sales during the Control Period and the Class Period is even more striking when measured in dollars. Collectively, Martin and Betterley's sales increased more than ***eighteen-fold***—or more than ***1,800%***—from the Control Period to the Class Period, from approximately $1,196,680 during the Control Period to over $21,604,524 during the Class Period. Separately, Martin's trading increased exponentially, more than 18 times from $974,935 during the Control Period to $17,672,752 during the Class Period.  Betterley's individual sales increased more than 17 times from $221,745 during the Control Period to $3,931,772 during the Class Period.

93.     Martin and Betterley's sales of stock were even more suspiciously timed because they sold a vast number of shares between the filing of the *Qui Tam* Action on July 15, 2013 and the disclosure of the DOJ investigation on May 9, 2014.  During this

time period, Martin sold 430,307 shares netting more than $12.4 million in proceeds.
Also during this time period, Betterley sold 45,930 shares netting more than $1.1 million
in proceeds.

94.     While some of Martin's and Betterley's stock sales were purportedly made
pursuant to Rule 10b5-1 trading plans, this provides no safe harbor as CSI's trading plans
had been the target of government investigations in the past.  For example, an April 24,
2013 Wall Street Journal article titled *Directors Take Shelter in Trading Plans*,
highlighted the alleged use of trading plans by a CSI corporate director to sell 83% of the
stock owned by one of his investment funds, ending his selling just six days before a
disappointing earnings announcement.  On April 30, 2013, just a week after the article,
the U.S. Attorney's Office for the Eastern District of New York issued subpoenas to CSI
launching a criminal investigation to determine whether the corporate director had been
misusing trading plans to cover up illegal insider trading.  On June 7, 2013, CSI filed a
Form 8-K with the SEC announcing that SEC began its own investigation into the CSI
director's trades.

95.     Throughout the Class Period, Martin and Betterley were able to, and did,
control the contents of the Company's SEC filings, reports, press releases, and other
public statements.  Martin and Betterley also signed certifications pursuant to the
Sarbanes-Oxley Act of 2002 in CSI's annual and quarterly reports filed throughout the
Class Period, which contained false and misleading statements of material fact.  Martin
and Betterley were provided with copies of, reviewed and approved, and/or signed such
filings, reports, releases, and other statements prior to or shortly after their issuance and

had the ability and opportunity to prevent their issuance or to cause them to be corrected.

Martin and Betterley were also able to, and did, directly or indirectly, control the conduct

of CSI's business, the information contained in its filings with the SEC, and its public

statements.  Moreover, they made or directed the making of affirmative statements to the

investing public, and participated in meetings, conference calls, and discussions

concerning such statements.  Martin and Betterley knew that the adverse facts specified

herein had not been disclosed to and were being concealed from the public, and that the

positive representations that were being made were then false and misleading.

### C.     A Separate *Qui Tam* Settlement Involving Martin's Prior Company Contributes To A Strong Inference Of Scienter

96.     Prior to joining CSI, Martin was Chief Operating Officer and Executive

Vice President of Sales and Marketing of Fox Hollow Technologies, Inc. ("Fox Hollow")

between January 2003 and February 2006.  Indeed, Martin personally presided over the

hiring of multiple Fox Hollow sales personnel and their installment in the CSI sales

hierarchy.  In February 2015, Fox Hollow settled an investigation brought by the DOJ

concerning various illegal marketing practices instituted at Fox Hollow between 2004

and 2008, which overlapped with Martin's time at the company.

## VII.   THE TRUTH EMERGES

97.     The truth regarding the Company's widespread scheme to inflate sales and

growth figures through the systematic employment of illegal sales tactics emerged

gradually through a series of partial revelations.

98.     On May 9, 2014, investors first began to learn that something was amiss at the Company.  In a Form 8-K Current Report signed by Martin and Betterley (the "May 9, 2014 Form 8-K"), Defendants disclosed that CSI had received notice that the USAO was investigating the Company "to determine whether the Company has violated the False Claims Act, resulting in the submission of false claims to federal and state health care programs, including Medicare and Medicaid."  Defendants further disclosed that the DOJ had served a Civil Investigative Demand for written interrogatories and document requests.  Nevertheless, at the same time, Defendants continued to falsely reassure investors of their legal compliance, stating that CSI "maintains rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements."

99.     Recognizing that their illegal sales and marketing tactics had to subside with the increased public focus and government investigation, Defendants undertook to expand CSI's sales force in order to both maintain CSI's artificially high sales and growth figures and continue to hide the fraud from public view.  On October 29, 2014, the Company announced this sales force expansion.  While the expansion temporarily boosted sales, it created a significant increase in the Company's selling, general, and administrative expenses ("SG&A") starting in CSI's third fiscal quarter of 2015, as CSI attempted to maintain its sales revenue.  These expenses caused significant losses for the Company as expenses jumped from $32.6 million in the second quarter of fiscal year 2015 to $39.4 million the following quarter.

100.    In connection with this sales force restructuring, and demonstrating that it was due to the increased scrutiny on CSI's illegal sales tactics resulting from the DOJ investigation and *Qui Tam* Action, CSI quietly terminated the employment of a central character in those same illegal practices, Jim Breidenstein, in mid-2015.

101.    However, as alleged below, CSI's efforts to restructure and increase its sales force could not make up for the loss of such a crucial sales and revenue driver as their illegal sales activity.  As a result, the financial performance of the Company gradually declined.

102.    On July 8, 2015, in a Form 8-K filed with the SEC and signed by Defendant Betterley, the Company stated "[a]s previously reported" the DOJ was "investigating the Company to determine whether the Company has violated the False Claims Act ("FCA")."  The 8-K further stated that the *Qui Tam* Action's complaint "underlying the [DOJ's] investigation was unsealed" that "allege[d] various causes of action under the federal FCA and several state FCA provisions relating to alleged kickbacks and off-label promotion of medical devices and that this alleged conduct has resulted in false claims being submitted to obtain payment or reimbursement."  Yet again, however, Defendants continued to falsely reassure investors of their legal compliance, stating that CSI "maintains rigorous policies and procedures to promote compliance with the [False Claims Act] and other regulatory requirements and intends to vigorously defend this lawsuit, should it proceed."

103.    On April 29, 2015, the Company announced its financial results for the third quarter of fiscal year 2015, disclosing that its sales force expansion—which was

implemented in order to make up for and mask the loss of sales due to decreased illegal activity—created a jump in expenses causing the Company to incur significant losses. In particular, the Company's same-day Form 8-K stated that "[n]et loss increased from the prior year primarily due to planned investments, including ***sales force expansion*** . . . ." The announcement caused the Company's stock to plummet 14% over the ensuing two days.

104.   On August 5, 2015, investors received a growing sense of the "chill" on Defendants' illegal practices resulting from the DOJ investigation when the Company announced disappointing results for the fourth quarter of fiscal year 2015. On that day, CSI reported revenues of $48 million, which was below consensus expectations of $50.1 million. As CEO Martin acknowledged in a Form 8-K filed with the SEC on August 5, 2015, CSI's "revenue was slightly below our expectations"—and expressly linked this to problems with CSI's sales force, including the "sale force expansion . . . [falling] short of our targets." The Company likewise noted that "revenue was slightly below guidance" and misleadingly claimed that was due to "sales headcount being below the levels targeted in the company's sale optimization and expansion plan during the quarter."

105.   On October 7, 2015, the "chill" on CSI's main revenue driver—namely, the scaled-back illegal sales tactics outlined herein—became more apparent when CSI reported disappointing preliminary financial results for the first quarter of fiscal year 2016. Indeed, CSI disclosed weaker than forecasted revenues of "approximately $43.9 million," which was significantly below its previously issued guidance of $48.5-$50 million, and staggering expected losses of $13.1 – $13.9 million—an increase of

approximately 60 – 70% over the prior quarter.  CEO Martin acknowledged the

disappointing results in CSI's October 7, 2015 press release—again tying it to issues with

the sales force expansion.  For example, Martin stated "as our recent results suggest,

some aspects of the [sales force expansion] have been challenging."  In other words, the

sales force expansion was not making up for the decline in revenues that had been

generated by illegal sales tactics.  Nevertheless, Martin continued to assure investors that,

ultimately, "[w]e see no change in our multi-billion market opportunity" and that CSI

would "capitalize on this opportunity and drive attractive double digit revenue growth

and profitability . . . ."

106.    On January 21, 2016, CSI announced yet another quarter of disappointing

financial results, with revenues of $41 million—3% below guidance, 4% below the

second quarter of fiscal year 2015, and a nearly 6% decline from the prior quarter.

Again, the Company expressly tied these disappointing results to continuing disruptions

in its sales force.  As CSI's interim CEO Scott Ward admitted in a Form 8-K filed the

same day, "CSI's sales force expansion . . . has been challenging and is affecting our near

term sales performance."  Ward then elaborated that "[t]he sales organization continues

to gain valuable experience and we *have begun to adjust our sales model at the local

level*, adopting a more flexible approach where warranted."  These statements left little

doubt that CSI was in the midst of an extensive and costly overhaul of its entire sales

organization.  Having digested these statements, the market finally came to realize that

Defendants' purported "sales force expansion" was a cover for reforms—necessitated by

the DOJ investigation—to excise illegal sales tactics, which meant more sales

representatives needed to be hired to make up for the loss of sales resulting that had

hitherto been dependent on the use of illegal sales methods.  The market reacted by

dumping the Company shares, which declined $3.72 per share—a nearly 30% drop—

from a close of $12.46 per share on January 21, 2016, to close at $8.74 per share on

January 22, 2016.

107.    As set forth in the below chart, from fiscal Q3 2015 through fiscal Q2 2016,

CSI's SG&A expenses and net losses were significantly higher than the preceding

periods.



Source: SEC Form 10-Q, dated February 2, 2016
Source: SEC Form 10-Q, dated November 6, 2015
Source: SEC Form 8-K, dated August 5, 2015
Source: SEC Form 10-Q, dated May 5, 2015
Source: SEC Form 10-Q, dated February 6, 2015

108.    As set forth in the below chart, after the fiscal fourth quarter of 2015, CSI's total revenues declined through the fiscal second quarter of 2016—while net losses increased.



Source: SEC Form 8-K, dated January 21, 2016
Source: SEC Form 8-K, dated November 4, 2015
Source: SEC Form 8-K, dated August 5, 2015
Source: SEC Form 8-K, dated April 29, 2015
Source: SEC Form 8-K, dated January 28, 2015
Source: SEC Form 8-K, dated October, 29, 2014

## VIII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.    September 12, 2011 – Fiscal Year 2011 Annual Report

109.    The Class Period begins on September 12, 2011.  On that date, CSI filed its Form 10-K Annual Report for the fiscal year ended June 30, 2011 with the SEC (the "2011 Form 10-K").  Betterley and Martin signed the 2011 Form 10-K.

110.     In the 2011 Form 10-K, the Company acknowledged and discussed the

applicability of the Federal Food, Drug, and Cosmetic Act (the "FDCA"), the federal

Anti-Kickback Statute, and the False Claims Act to the Company:

> Our operations will be directly, or indirectly through our customers, subject to various state and federal fraud and abuse laws, including, without limitation, the FDCA, federal Anti-Kickback Statute and False Claims Act.  These laws may impact, among other things, our proposed sales, marketing, and education programs.  In addition, these laws require us to screen individuals and other companies, suppliers and vendors in order to ensure that they are not "debarred" by the federal government and therefore prohibited from doing business in the healthcare industry.
>
> The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as the Medicare and Medicaid programs.  Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated.  The Anti-Kickback Statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry.  Many states have also adopted laws similar to the federal Anti-Kickback Statute, some of which apply to the referral of patients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.
>
> The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Various states have also enacted laws modeled after the federal False Claims Act.

111.   The Company also attached its "CODE OF ETHICS AND BUSINESS

CONDUCT" (the "Code of Ethics") as Exhibit 14.1 to the 2011 Annual Report.  The

Code of Ethics stated in relevant part (all emphases in original):

> **Bribery, kickbacks or other improper or illegal payments have no place in CSI's business.**
>
> * * *
>
> *Business Courtesies and Gratuities*
>
> **CSI's policy is not to offer or accept kickbacks or bribes, or gifts of substantial value.**
>
> CSI Representatives may only exchange non-monetary and modestly-valued gifts that promote goodwill with our business partners and do not improperly influence others.  We will accept only approved and widely available discounts and do not encourage, accept or exchange gratuities or payments for providing services to others.
>
> ***
>
> Representatives must deal fairly and honestly with the Company's customers (including potential customers and Health Care Professionals or entities in a position to recommend or influence the purchase or use of Company products) and not take actions that are prohibited by applicable law or ethical standards.
>
> ***
>
> The following general standards and principles should at all times guide our interactions with customers and Health Care Professionals:
>
> - CSI will encourage ethical business practices and socially responsible industry conduct, and will not use any unlawful inducement in order to sell, recommend or arrange the sale, or prescription of its products.
>
> ***

- Interactions should be focused on informing customers and prospective customers about products, providing scientific and educational information, and supporting medical research and education and should not, at any time, entice representatives of customers to place their own personal interests above those of the organizations they represent or the patients who will use or need the Company's products.

- CSI will not, directly or indirectly, offer or solicit any kind of payments or contributions for the purpose of obtaining, giving, keeping or rewarding business.

**No Payments in exchange for business**

Representatives may not make payments to customers or provide meals, travel expenses, entertainment, gifts, or other benefits to customers or Health Care Professionals in exchange for the customer's agreement to purchase products or services from the Company, or as a reward for the purchase of products or services, nor may Representatives provide benefits to a customer's friends, relatives, or organizations closely affiliated with the customer in exchange for or as a reward for such business.

112.    The statements from the 2011 Form 10-K set forth above in Paragraphs 110 and 111 were materially false and misleading because they did not disclose that the Company was, in fact, not in compliance with applicable laws, including the AKS and False Claim Act, or the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

113.    The 2011 Form 10-K disclosed results of operations expressed as dollar amounts (in thousands) as follows:

| | | Year Ended June 30, | |
|---|---|---|---|
| | | 2011 | 2010 |
| Revenues | $ | 78,780 | 64,829 |
| Cost of goods sold | | 16,277 | 15,003 |
| Gross Profit | | 62,503 | 49,826 |
| Expenses: | | | |
| Selling, general and administrative | | 62,372 | 62,447 |
| Research and development | | 8,940 | 10,278 |
| Total expenses | | 71,312 | 72,725 |
| Loss from operations | | (8,809) | (22,899) |
| Interest and other income (expense) | | (2,316) | (1,005) |
| Net loss | | (11,125) | (23,904) |

114.     The statements from the 2011 Form 10-K set forth above in Paragraph 113 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

115.     The same Form 10-K specifically stated that "we expect our revenue to increase as we increase the number of physicians using the devices, and increase the usage per physician as we continue to focus on physician education programs, introduce new and improved products, and generate clinical data."

116.    By stating that the Company expected revenues to grow through legitimate market uptake, specifically physician adoption and "educational programs," and by failing to disclose that a plan was in place to rely systematically on unsustainable kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, these statements from the 2011 Form 10-K in Paragraph 115 above were materially false and misleading when made.

117.    The 2011 Form 10-K was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the 2011 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

**B.    October 6, 2011 – Q1 2012 Press Release**

118.    On October 6, 2011, the Company issued a press release disclosing its preliminary first quarter 2012 financial results (the "Q1 2012 Press Release"), announcing "preliminary revenue of approximately $18.7 million for the fiscal 2012 first quarter ended September 30, 2011, compared with $18.2 million in the first quarter of fiscal 2011."

119.    The statements from the Q1 2012 Press Release set forth above in Paragraph 118 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### C. October 6, 2011 – Q1 2012 Earnings Call

120. On October 6, 2011, CSI held a conference call with analysts to discuss the Company's first quarter 2012 earnings (the "Q1 2012 Earnings Call"). Martin and Betterley participated in this call. Betterley stated that CSI announced "revenue for the first quarter of fiscal 2012 of approximately $18.7 million, which is 3% greater than the $18.2 million posted in last year's first quarter" and "[d]evice unit sales were similar to last year at nearly 5300 devices." Admitting that sales were lower than expected, Martin specifically attributed revenues to "short-term marketplace dynamics and transitions," and added that "Our Sales and Marketing organization is going through some beneficial adjustments to staffing and improved processes. As a result, we expect our revenues to grow substantially for the remainder of the year and achieve double-digit growth for the full fiscal year 2012 over fiscal 2011."

121. This was the same call in which Martin first touted the recent addition of Kevin Kenny, who he stated was introducing "many upgrades to our Sales and Marketing organization."

122.    The statements from the Q1 2012 Earnings Call set forth above in Paragraphs 120 and 121 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

123.    Indeed, the Company affirmatively misled the investing public by predicting—accurately—that investors shall soon see "double-digit" growth, but specifically attributing that predicted growth to "beneficial adjustments to staffing and improved processes," rather than the planned commencement of regulatory violations.

**D.    November 8, 2011 – Q1 2012 Form 10-Q**

124.    On November 8, 2011, the Company filed its Form 10-Q Quarterly Report for the first quarter of fiscal year 2012 with the SEC (the "Q1 2012 Form 10-Q").  The Q1 2012 Form 10-Q was signed by Martin and Betterley.

125.    The Q1 2012 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended September 30, | |
| --- | --- | --- |
|  | **2011** | **2010** |
| Revenues | $          18,660 | 18,165 |
| Cost of goods sold | 4,346 | 4,141 |
| Gross Profit | 14,314 | 14,024 |
| Expenses | | |
| Selling, general and administrative | 15,350 | 15,496 |
| Research and development | 2,064 | 2,422 |
| Total expenses | 17,414 | 17,918 |
| Loss from operations | (3,100) | (3,894) |
| Interest and other, net | (759) | (374) |
| Net loss | (3,859) | (4,268) |

126.   The company accompanied these results with the following statement:

Revenue for the three months ended September 30, 2011 was impacted by several factors, primarily high customer demand for conversion to the new Stealth 360° PAD System and movement by some high-volume physicians from hospitals to office-based labs.   Both of these developments consumed selling time and temporarily delayed sales as purchases transitioned between sites and product lines.   The impact was heightened by changes made in sales and marketing to position us to scale for high revenue growth in the future, and by a general softness in PAD procedures.

127.   The statements from the Q1 2012 Form 10-Q set forth above in Paragraphs 125 and 126 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

128.   The Q1 2012 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q1 2012 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### E.   February 7, 2012 – Q2 2012 Press Release

129.   On February 7, 2012, the Company issued a press release disclosing its second quarter 2012 financial results (the "Q2 2012 Press Release"), announcing "revenues in the second quarter rose to $19.7 million, a 5 percent gain over revenues of $18.8 million in the second quarter of last fiscal year."

130.   The statements from the Q2 2012 Press Release set forth above in Paragraph 129 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

###### F.      February 7, 2012 – Q2 2012 Earnings Call

131.    On February 7, 2012, CSI held a conference call with analysts to discuss the Company's second quarter 2012 earnings (the "Q2 2012 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[f]or the second quarter of fiscal 2012 compared to a year ago, revenues grew 6% sequentially and 5% over the prior year to $19.7 million" and "[o]ver 5,500 devices were sold in the quarter."

132.    The statements from the Q2 2012 Earnings Call set forth above in Paragraph 131 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

###### G.      February 9, 2012 – Q2 2012 Form 10-Q

133.    On February 9, 2012, the Company filed its Form 10-Q Quarterly Report for the second quarter of fiscal year 2012 with the SEC (the "Q2 2012 Form 10-Q").  The Q2 2012 Form 10-Q was signed by Martin and Betterley.

134.    The Q2 2012 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended December 31, | |
|---|---|---|
|  | **2011** | **2010** |
| Revenues | $        19,718 | 18,756 |
| Cost of goods sold | 4,560 | 3,972 |
| Gross Profit | 15,158 | 14,784 |
| Expenses | | |
| Selling, general and administrative | 15,733 | 14,687 |
| Research and development | 3,084 | 2,114 |
| Total expenses | 18,817 | 16,801 |
| Loss from operations | (3,659) | (2,017) |
| Interest and other, net | (476) | 27 |
| Net loss | (4,135) | (1,990) |

135.    The Q2 2012 Form 10-Q specifically stated that the growth in revenue was "primarily from increased average selling prices."  The statements from the Q2 2012 Form 10-Q set forth in this Paragraph and above in Paragraph 134 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

136.    The Q2 2012 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q2 2012 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### H.    May 2, 2012 – Q3 2012 Press Release

137.    On May 2, 2012, the Company issued a press release disclosing its third quarter 2012 financial results (the "Q3 2012 Press Release"), announcing "CSI's revenues in the third quarter rose to $21.2 million, an 8 percent increase over the second quarter of fiscal 2012, and a 5 percent gain over revenues of $20.2 million in the third quarter of last fiscal year."

138.    The statements from the Q3 2012 Press Release set forth above in Paragraph 137 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

## I.   May 2, 2012 – Q3 2012 Earnings Call

139.   On May 2, 2012, CSI held a conference call with analysts to discuss the Company's third quarter 2012 earnings (the "Q3 2012 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[f]or the third quarter of fiscal 2012 compared to a year ago, revenues grew 5% and 8% sequentially over the second quarter of 2012 to $21.2 million" and "[o]ver 5,800 devices were sold."

140.   The statements from the Q3 2012 Earnings Call set forth above in Paragraph 139 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

141.   During the call, an analyst questioned if the sales force restructuring and the way CSI was selling its products were the reason that revenue stabilized.  Martin responded:

> I do think that some of the hires that we made nine months ago have taken effect these past few quarters as we grew 6% and then consecutively here 8%.  We're bringing in people

who are appropriate for mainstream adoption as we enter in and try to make this procedure mainstream. We've got Kevin Kenny who has managed over 1,500 people. In January we brought on Jim Breidenstein as VP of Sales who had five years at Kyphon and success with growth and making that procedure mainstream . . . And just a couple of examples, we brought our sales team together for the first time under the— Kevin and Jim's leadership in January for education and motivation as an entire group.

142.     The statements from the Q3 2012 Earnings Call in Paragraph 141 above were materially false and misleading when made because while touting CSI's new sales management, Martin did not disclose that the same management was implementing a sales strategy of illegal and improper kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products. Indeed, this false and misleading statement was made in direct response to a question specifically targeted at the Company's sales methods, and any answer other than an admission of illegality in its sales practices would have been false, as was the case here.

**J.**    **May 8, 2012 – Q3 2012 Form 10-Q**

143.     On May 8, 2012, the Company filed its Form 10-Q Quarterly Report for the third quarter of fiscal year 2012 with the SEC (the "Q3 2012 Form 10-Q"). The Q3 2012 Form 10-Q was signed by Martin and Betterley.

144.     The Q3 2012 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

| | | Three Months Ended March 31, | |
| --- | --- | --- | --- |
| | | 2012 | 2011 |
| Revenues | $ | 21,205 | 20,152 |
| Cost of goods sold | | 5,132 | 3,949 |
| Gross Profit | | 16,073 | 16,203 |
| Expenses | | | |
| Selling, general and administrative | | 16,809 | 16,415 |
| Research and development | | 2,985 | 1,780 |
| Total expenses | | 19,794 | 18,195 |
| Loss from operations | | (3,721) | (1,992) |
| Interest and other, net | | (470) | (392) |
| Net loss | | (4,191) | (2,384) |

145.    The Q3 2012 Form 10-Q continued to attribute revenue increases to "increased average selling price as a result of the introduction of the Stealth 360°," a more expensive device than prior CSI products.  These statements from the Q3 2012 Form 10-Q set forth in this Paragraph and above in Paragraph 144 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

146.    The Q3 2012 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that

the Q3 2012 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

###### K.    August 8, 2012 – Q4 2012 Press Release

147.    On August 8, 2012, the Company issued a press release disclosing its fourth quarter 2012 financial results (the "Q4 2012 Press Release"), announcing "CSI's fourth-quarter revenues rose to $22.9 million, an 8 percent gain over the fiscal 2012 third quarter and up 6 percent over $21.7 million in the fourth quarter of fiscal 2011."

148.    The statements from the Q4 2012 Press Release set forth above in Paragraph 147 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**L.** **August 8, 2012 – Q4 2012 Earnings Call**

149.    On August 8, 2012, CSI held a conference call with analysts to discuss the Company's fourth quarter of fiscal year 2012 earnings (the "Q4 2012 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[f]or the fourth quarter of fiscal 2012 compared to a year ago revenues grew 6% over the prior year and 8% sequentially to $22.9 million" and "[n]early 6,300 devices were sold in the quarter."

150.    The statements from the Q4 2012 Earnings Call set forth above in Paragraph 149 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**M.** **September 10, 2012 – Fiscal Year 2012 Annual Report**

151.    On September 10, 2012, CSI filed its Form 10-K Annual Report for the fiscal year ended June 30, 2012 with the SEC (the "2012 Form 10-K").  Betterley and Martin signed the 2012 Form 10-K.

152.    The 2012 Form 10-K also acknowledged and discussed the applicability of the FDCA, federal Anti-Kickback Statute, and False Claims Act to the Company:

Our operations will be directly, or indirectly through our customers, subject to various state and federal fraud and abuse laws, including, without limitation, the FDCA, federal Anti-Kickback Statute and False Claims Act. These laws may impact, among other things, our proposed sales, marketing, and education programs. In addition, these laws require us to screen individuals and other companies, suppliers and vendors in order to ensure that they are not "debarred" by the federal government and therefore prohibited from doing business in the healthcare industry.

The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as the Medicare and Medicaid programs. Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated. The Anti-Kickback Statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry. Many states have also adopted laws similar to the federal Anti-Kickback Statute, some of which apply to the referral of patients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.

The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Various states have also enacted laws modeled after the federal False Claims Act.

153.    The statements from the 2012 Form 10-K set forth above in Paragraph 152 were materially false and misleading because they did not disclose that the Company was, in fact, not in compliance with applicable laws, including the AKS and False Claim Act, or the Company's Code of Ethics, because, as confirmed by internal CSI documents

and former employees, the Company engaged in illegal sales tactics, including entering

into *quid pro quo* arrangements with physician-customers by offering to generate patient

referrals for these customers in exchange for their purchases of CSI products.

154.   The 2012 Form 10-K disclosed results of operations expressed as dollar

amounts (in thousands) as follows:

| | | Year Ended June 30, | |
| | | 2012 | 2011 |
|---|---|---|---|
| Revenues | $ | 82,490 | 78,780 |
| Cost of goods sold | | 19,216 | 16,277 |
| Gross Profit | | 63,274 | 62,503 |
| Expenses: | | | |
| Selling, general and administrative | | 66,366 | 62,372 |
| Research and development | | 11,374 | 8,940 |
| Total expenses | | 77,740 | 71,312 |
| Loss from operations | | (14,466) | (8,809) |
| Interest and other income (expense) | | (2,324) | (2,316) |
| Net loss | | (16,790) | (11,125) |

155.   The 2012 Form 10-K again attributed the growth in revenue to "increased

average selling prices of PAD Systems."  These statements from the 2012 Form 10-K set

forth in this Paragraph and above in Paragraph 154 were materially false and misleading

because they did not disclose the fact that revenues from the sales of the Company's PAD

Devices were artificially inflated by and depended on CSI engaging in systemic,

unsustainable violations of applicable laws, including the AKS and False Claim Act, and

the Company's Code of Ethics, because, as confirmed by internal CSI documents and

former employees, the Company engaged in illegal sales tactics, including entering into

*quid pro quo* arrangements with physician-customers by offering to generate patient

referrals for these customers in exchange for their purchases of CSI products.

156.   The 2012 Form 10-K was accompanied by signed certifications, as required

by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the 2012

Form 10-K "does not contain any untrue statement of a material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading" and that "the financial statements, and

other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant."

**N.**   **October 30, 2012 – Q1 2013 Press Release**

157.   On October 30, 2012, the Company issued a press release disclosing its first

quarter 2013 financial results (the "Q1 2013 Press Release"), announcing "CSI's first-

quarter revenues grew to $23.3 million, a 25 percent increase over the first quarter of

fiscal 2012."

158.   The statements from the Q1 2013 Press Release set forth above in

Paragraph 157 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws,

including the AKS and False Claim Act, and the Company's Code of Ethics, because, as

confirmed by internal CSI documents and former employees, the Company engaged in

illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### O.  October 30, 2012 – Q1 2013 Earnings Call

159.  On October 30, 2012, CSI held a conference call with analysts to discuss the Company's first quarter of fiscal year 2013 earnings (the "Q1 2013 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[f]or the first quarter of fiscal 2013 compared to a year ago, revenues grew 25% to $23.3 million" and "[m]ore than 6,400 devices were sold in the quarter."

160.  The statements from the Q1 2013 Earnings Call set forth above in Paragraph 159 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

161.  During the call, Martin specifically cited new sales management, Kevin Kenny and Jim Breidenstein, as one of the reasons for CSI's revenue growth.  Martin stated that they "come with great experience, experience to scale, they're here to scale, and they're really activating the most important resource in the Company—people."

162.    The statements from the Q1 2013 Earnings Call in Paragraph 161 above were materially false and misleading when made because while touting CSI's new management, Martin did not disclose that in fact the growth was the result of an unsustainable sales strategy of illegal and improper kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**P.**      **November 8, 2012 – Q1 2013 Form 10-Q**

163.    On November 8, 2012, the Company filed its Form 10-Q Quarterly Report for the first quarter of fiscal year 2013 with the SEC (the "Q1 2013 Form 10-Q").  The Q1 2013 Form 10-Q was signed by Martin and Betterley.

164.    The Q1 2013 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | **Three Months Ended September 30,** | |
| --- | --- | --- |
|  | **2012** | **2011** |
| Revenues | $     23,293 | $     18,660 |
| Cost of goods sold | 5,254 | 4,346 |
| Gross Profit | 18,039 | 14,314 |
| Expenses | | |
| Selling, general and administrative | 20,023 | 15,350 |
| Research and development | 3,222 | 2,064 |
| Total expenses | 23,245 | 17,414 |
| Loss from operations | (5,206) | (3,100) |
| Interest and other, net | (4) | (759) |
| Net loss and comprehensive loss | (5,210) | (3,859) |

165.    The statements from the Q1 2013 Form 10-Q set forth above in Paragraph 164 were materially false and misleading because they did not disclose the fact that

revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

166.   The Q1 2013 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q1 2013 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

**Q.   <u>January 30, 2013 – Q2 2013 Press Release</u>**

167.   On January 30, 2013, the Company issued a press release disclosing its second quarter 2013 financial results (the "Q2 2013 Press Release"), announcing "CSI's second-quarter revenues rose to $25.3 million, a 28 percent gain from $19.7 million in the second quarter of fiscal 2012."

168.   The statements from the Q2 2013 Press Release set forth above in Paragraph 167 were materially false and misleading because they did not disclose the fact

- 73 -

that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

###     R.     January 30, 2013 – Q2 2013 Earnings Call

169.    On January 30, 2013, CSI held a conference call with analysts to discuss the Company's second quarter of fiscal year 2013 earnings (the "Q2 2013 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[f]or the second quarter of fiscal 2013 compared to a year ago, revenues grew 28% to $25.3 million" and "[m]ore than 7,000 devices were sold in the quarter."

170.    The statements from the Q2 2013 Earnings Call set forth above in Paragraph 169 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

171.     During the call, analysts questioned the sustainability of CSI's sales

growth.  Martin responded by again attributing sales growth specifically to excellent sales

management, rather than illicit practices, stating:

> The installation of some key management and some of the
> systems and programs and process that we've installed over
> the last six quarters continues to gain steam.  The enthusiasm
> is high and the competence has never been as high, on the
> clinical and economic outcomes that we can provide, **the way
> we're targeting physicians** and using our valuable limited
> resource of time.  So it has grown every quarter; the team
> does more and more with quality every quarter; and that's
> true, I think, about the company.  **This was the best-
> managed quarter we've ever had and that is sustainable**.  I
> think that's a great indicator that as we scale, we could handle
> the responsibility and continue the great results.

172.     In addition, Martin explained that among other things that Kevin Kenny has

implemented, "[m]edical education has been a big hit."  These statements from the Q2

2013 Earnings Call set forth in this Paragraph and in Paragraph 171 above were

materially false and misleading when made because they did not disclose that CSI used

illegal and unsustainable kickbacks, such as entering into *quid pro quo* arrangements with

physician-customers by offering to generate patient referrals for these customers in

exchange for their purchases of CSI products.

**S.      February 8, 2013 – Q2 2013 Form 10-Q**

173.     On February 8, 2013, the Company filed its Form 10-Q Quarterly Report

for the second quarter of fiscal year 2013 with the SEC (the "Q2 2013 Form 10-Q").  The

Q2 2013 Form 10-Q was signed by Martin and Betterley.

174.    The Q2 2013 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

| | Three Months Ended December 31, | | | |
| | 2012 | | 2011 | |
| --- | --- | --- | --- | --- |
| Revenues | $ | 25,309 | $ | 19,718 |
| Cost of goods sold | | 5,958 | | 4,560 |
| Gross Profit | | 19,351 | | 15,158 |
| Expenses | | | | |
| Selling, general and administrative | | 20,418 | | 15,733 |
| Research and development | | 4,055 | | 3,084 |
| Total expenses | | 24,473 | | 18,817 |
| Loss from operations | | (5,122) | | (3,659) |
| Interest and other, net | | (645) | | (476) |
| Net loss and comprehensive loss | | (5,767) | | (4,135) |

175.    The Q2 2013 Form 10-Q then stated that the growth in revenue was "primarily from an increased number of devices sold," leaving unsaid that the sales were procured by illegal means.  The statements from the Q2 2013 Form 10-Q set forth in this Paragraph and above in Paragraph 174 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

176.    The Q2 2013 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q2 2013 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### T.      **March 20, 2013 – Prospectus**

177.    On March 20, 2013, the Company filed a prospectus, dated March 19, 2013, on a Form 424B5 with the SEC (the "March 2013 Prospectus") to announce the public offering of up to 2.3 million shares of Company common stock underwritten by Leerink Swann LLC and JMP Securities LLC.  The March 2013 Prospectus incorporated a registration statement on Form S-3 filed with SEC on October 14, 2011 and declared effective on October 27, 2011.  Martin and Betterley wrote, adopted, and approved of the contents of the March 2013 Prospectus.

178.    On March 25, 2013, pursuant to the March 2013 Prospectus, the Company sold 2.3 million shares of its common stock at $17.60 per share, yielding net proceeds to the Company, after deducting underwriting discounts, commissions, and expenses, of $38.2 million.

**U.     May 1, 2013 – Q3 2013 Press Release**

179.    On May 1, 2013, the Company issued a press release disclosing its third

quarter 2013 financial results (the "Q3 2013 Press Release"), announcing "CSI's third-

quarter revenues rose to $26.5 million, a 25-percent gain from $21.2 million in the third

quarter of fiscal 2012."

180.    The statements from the Q3 2013 Press Release set forth above in

Paragraph 179 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws,

including the AKS and False Claim Act, and the Company's Code of Ethics, because, as

confirmed by internal CSI documents and former employees, the Company engaged in

illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for

their purchases of CSI products.

**V.     May 1, 2013 – Q3 2013 Earnings Call**

181.    On May 1, 2013, CSI held a conference call with analysts to discuss the

Company's third quarter of fiscal year 2013 earnings (the "Q3 2013 Earnings Call").

Martin and Betterley participated in this call.  Betterley stated that "[f]or the third quarter

of fiscal 2013 compared to a year ago, revenues grew 25% to $26.5 million" and CSI

"sold more than 7,300 devices."

182.    The statements from the Q3 2013 Earnings Call set forth above in

Paragraph 181 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

183.    During the Q3 2013 Earnings Call, an analyst asked Martin "how do you maintain your focus on significant growth, 20%-plus, in the PAD market."  In response, Martin again attributed growth to superior sales management while leaving out the reality of unethical sales tactics, stating:

> You get great management.  We've hired some spectacular management in every department, I mean, really across the board.  One of the things that we've done with our investment opportunities is filled in that middle layer of management and that executive management with people who know what it looks like to scale and to scale of quality.  I just can't say enough about the CSI team.  And they're hiring phenomenal people, and the Company's backing up that hiring with employee training.  Just one example is we used to struggle to afford ourselves just one national sales meeting a year during the financial crisis, and now we're committed to two, and the quality of these two, I mean, people are educated in a high-quality way, and they're really delivering that impact to their physicians, and the physicians are talking about it.  There has been a substantial upgrade at the Company.

184.    The statements from the Q3 2013 Earnings Call in Paragraph 183 above were materially false and misleading when made because, while touting CSI's new management, Martin did not disclose that the same management was implementing a

sales strategy of illegal and improper kickbacks, such as entering into *quid pro quo*

arrangements with physician-customers by offering to generate patient referrals for these

customers in exchange for their purchases of CSI products.

**W.**    **May 9, 2013 – Q3 2013 Form 10-Q**

185.    On May 9, 2013, the Company filed its Form 10-Q Quarterly Report for the

third quarter of fiscal year 2013 with the SEC (the "Q3 2013 Form 10-Q").  The Q3 2013

Form 10-Q was signed by Martin and Betterley.

186.    The Q3 2013 Form 10-Q disclosed the Company's results of operations

expressed as dollar amounts (in thousands) as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2013 | 2012 |
| Revenues | $       26,474 | 21,205 |
| Cost of goods sold | 6,241 | 5,132 |
| Gross Profit | 20,233 | 16,073 |
| Expenses | | |
| Selling, general and administrative | 21,650 | 16,809 |
| Research and development | 3,993 | 2,985 |
| Total expenses | 25,643 | 19,794 |
| Loss from operations | (5,410) | (3,721) |
| Interest and other, net | (809) | (470) |
| Net loss and comprehensive loss | (6,219) | (4,191) |

187.    The Q3 2013 Form 10-Q repeated the attribution of growing revenues to

"primarily [] an increased number of devices sold," while saying nothing about sales

practices.  The statements from the Q3 2013 Form 10-Q set forth in this Paragraph and

above in Paragraph 186 were materially false and misleading because they did not

disclose the fact that revenues from the sales of the Company's PAD Devices were

artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

188.    The Q3 2013 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q3 2013 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### X.    <u>August 7, 2013 – Q4 2013 Press Release</u>

189.    On August 7, 2013, the Company issued a press release disclosing its fourth quarter 2013 financial results (the "Q4 2013 Press Release"), announcing "CSI's fourth-quarter revenues rose to $28.8 million, a 26-percent gain from $22.9 million in the fourth quarter of fiscal 2012."

190.    The statements from the Q4 2013 Press Release set forth above in Paragraph 189 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**Y.      August 7, 2013 – Q4 2013 Earnings Call**

191.    On August 7, 2013, CSI held a conference call with analysts to discuss the Company's fourth quarter of fiscal year 2013 earnings (the "Q4 2013 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[f]or the fourth quarter of fiscal 2013 compared to a year ago, revenues grew 26%, to $28.8 million" and CSI "sold more than 8,100 devices."

192.    The statements from the Q4 2013 Earnings Call set forth above in Paragraph 191 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**Z.**    **September 11, 2013 – Fiscal Year 2013 Annual Report**

193.    On September 11, 2013, CSI filed its Form 10-K Annual Report for the

fiscal year ended June 30, 2013 with the SEC (the "2013 Form 10-K").  Betterley and

Martin signed the 2013 Form 10-K.

194.    The 2013 Form 10-K also acknowledged and discussed the applicability of

the FDCA, federal Anti-Kickback Statute, and False Claims Act to the Company:

> Our operations will be directly, or indirectly through our
> customers, subject to various state and federal fraud and
> abuse laws, including, without limitation, the FDCA, federal
> Anti-Kickback Statute and False Claims Act.  These laws
> may impact, among other things, our proposed sales,
> marketing, and education programs.  In addition, these laws
> require us to screen individuals and other companies,
> suppliers and vendors in order to ensure that they are not
> "debarred" by the federal government and therefore
> prohibited from doing business in the healthcare industry.
>
> The federal Anti-Kickback Statute prohibits persons from
> knowingly and willfully soliciting, offering, receiving or
> providing remuneration, directly or indirectly, in exchange for
> or to induce either the referral of an individual, or the
> furnishing or arranging for a good or service, for which
> payment may be made under a federal healthcare program
> such as the Medicare and Medicaid programs.  Several courts
> have interpreted the statute's intent requirement to mean that
> if any one purpose of an arrangement involving remuneration
> is to induce referrals of federal healthcare covered business,
> the statute has been violated.  The Anti-Kickback Statute is
> broad and prohibits many arrangements and practices that are
> lawful in businesses outside of the healthcare industry.  Many
> states have also adopted laws similar to the federal Anti-
> Kickback Statute, some of which apply to the referral of
> patients for healthcare items or services reimbursed by any
> source, not only the Medicare and Medicaid programs.
>
> The federal False Claims Act prohibits persons from
> knowingly filing or causing to be filed a false claim to, or the

knowing use of false statements to obtain payment from, the federal government. Various states have also enacted laws modeled after the federal False Claims Act.

195.    The statements from the 2013 Form 10-K set forth above in Paragraph 194 were materially false and misleading because they did not disclose that the Company was, in fact, not in compliance with applicable laws, including the AKS and False Claim Act, or the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

196.    The 2013 Form 10-K disclosed results of operations expressed as dollar amounts (in thousands) as follows:

|  | Year Ended June 30, | |
| --- | --- | --- |
|  | **2013** | **2012** |
| Revenues | $        103,897 | $        82,490 |
| Cost of goods sold | 24,382 | 19,216 |
| Gross Profit | 79,515 | 63,274 |
| Expenses: | | |
| Selling, general and administrative | 86,718 | 66,366 |
| Research and development | 15,216 | 11,374 |
| Total expenses | 101,934 | 77,740 |
| Loss from operations | (22,419) | (14,466) |
| Interest and other, net | (1,618) | (2,324) |
| Net loss | (24,037) | (16,790) |

197.    The statements from the 2013 Form 10-K set forth above in Paragraph 196 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended

on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

198. The 2013 Form 10-K was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the 2013 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### AA. October 30, 2013 – Q1 2014 Press Release

199. On October 30, 2013, the Company issued a press release disclosing its first quarter 2014 financial results (the "Q1 2014 Press Release"), announcing "CSI's first-quarter revenues rose to $29.8 million, a 28-percent gain from $23.3 million in the first quarter of fiscal 2013."

200. The statements from the Q1 2014 Press Release set forth above in Paragraph 199 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws,

including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### BB.  October 30, 2013 – Q1 2014 Earnings Call

201.    On October 30, 2013, CSI held a conference call with analysts to discuss the Company's first quarter of fiscal year 2014 earnings (the "Q1 2014 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[f]or the first quarter of fiscal 2014 compared to a year ago, revenues grew 28 percent to $29.8 million" and CSI "sold more than 8,500 devices."

202.    The statements from the Q1 2014 Earnings Call set forth above in Paragraph 201 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

CC.    **November 4, 2013 – Q1 2014 Form 10-Q**

203.    On November 4, 2013, the Company filed its Form 10-Q Quarterly Report for the first quarter of fiscal year 2014 with the SEC (the "Q1 2014 Form 10-Q"). The Q1 2014 Form 10-Q was signed by Martin and Betterley.

204.    The Q1 2014 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended September 30, | | | |
|---|---|---|---|---|
|  | **2013** | | **2012** | |
| Revenues | $ | 29,766 | $ | 23,293 |
| Cost of goods sold | | 6,864 | | 5,254 |
| Gross Profit | | 22,902 | | 18,039 |
| Expenses | | | | |
| Selling, general and administrative | | 25,371 | | 20,023 |
| Research and development | | 4,378 | | 3,222 |
| Total expenses | | 29,749 | | 23,245 |
| Loss from operations | | (6,847) | | (5,206) |
| Interest and other, net | | (445) | | (4) |
| Net loss and comprehensive loss | | (7,292) | | (5,210) |

205.    The statements from the Q1 2014 Form 10-Q set forth above in Paragraph 204 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

206.    The Q1 2014 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q1 2014 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

###    DD.    November 21, 2013 - Prospectus

207.    On November 21, 2013, the Company filed a prospectus, dated November 20, 2013, on a Form 424B5 (the "November 2013 Prospectus") to announce the public offering of up to 3 million shares of Company common stock underwritten by Merrill Lynch, Pierce, Fenner & Smith, Incorporated, Leerink Swann LLC, William Blair & Company, LLC, JMP Securities LLC, Dougherty & Company LLC, Feltl and Company, Inc., and Wunderlich Securities, Inc.  The November 2013 Prospectus incorporated a registration statement on Form S-3 filed with SEC on October 25, 2013 and declared effective on October 28, 2013.  Martin and Betterley wrote, adopted, and approved of the contents of the November 2013 Prospectus.

208.    On November 26, 2013, pursuant to the November 2013 Prospectus, the Company sold 3 million shares of its common stock at $30.00 per share, yielding net

proceeds to the Company, after deducting underwriting discounts, commissions, and expenses, of about $84.4 million.

**EE.  January 29, 2014 – Q2 2014 Press Release**

209.   On January 29, 2014, the Company issued a press release disclosing its second quarter 2014 financial results (the "Q2 2014 Press Release"), announcing "CSI's second-quarter revenues rose to $32.3 million, a 28 percent gain from $25.3 million in the second quarter of fiscal 2013."

210.   The statements from the Q2 2014 Press Release set forth above in Paragraph 209 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**FF.  January 29, 2014 – Q2 2014 Earnings Call**

211.   On January 29, 2014, CSI held a conference call with analysts to discuss the Company's second quarter of fiscal year 2014 earnings (the "Q2 2014 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to a year ago, total revenues grew 28% to $32.3 million" and CSI "sold nearly 9,400 devices."

212.    In his overview of the Company's quarterly results, Martin stated, "Revenues rose 28% year-over-year, and 9% sequentially over the first quarter of this fiscal year. We continue to drive success in the PAD market with our easy-to-use technology."

213.    In response to an analyst's questions about the Company's user base and its new customer accounts, Martin stated, "We're committed to medical education and that's one of the driving forces to market expansion, which we've experienced fantastically in peripheral, we'll experience that fantastically in coronary, as well."  He then specifically praised the sales team, stating "Another driver, too, Jose, is our field sales team.  Their intellect and execution has been superior.  They have prepared so hard in advance of handling a second franchise and it's really showing up in the quality of outcomes in the patient outcomes, but also the physician satisfaction with how we deliver that technology into an institution and get them to their first case.  It's been fantastic."  He repeated these statements again later, stating, "We've got a fantastic medical education capability here at the Company that we've used to drive good results, and growth and market expansion on the peripheral side."

214.    The statements from the Q2 2014 Earnings Call set forth above in Paragraphs 211 through 213 were materially false and misleading because they specifically attributed "fantastic[]" sales to "easy-to-use technology," "medical education," and a well "prepared" sales team, but did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the

AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### GG.   February 7, 2014 – Q2 2014 Form 10-Q

215.   On February 7, 2014, the Company filed its Form 10-Q Quarterly Report for the second quarter of fiscal year 2014 with the SEC (the "Q2 2014 Form 10-Q").  The Q2 2014 Form 10-Q was signed by Martin and Betterley.

216.   The Q2 2014 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

| | **Three Months Ended December 31,** | |
| --- | --- | --- |
| | **2013** | **2012** |
| Revenues | $      32,337 | $       25,309 |
| Cost of goods sold | 7,313 | 5,958 |
| Gross Profit | 25,024 | 19,351 |
| Expenses | | |
| Selling, general and administrative | 27,468 | 20,418 |
| Research and development | 5,051 | 4,055 |
| Total expenses | 32,519 | 24,473 |
| Loss from operations | (7,495) | (5,122) |
| Interest and other, net | (1,163) | (645) |
| Net loss and comprehensive loss | (8,658) | (5,767) |

217.   The statements from the Q2 2014 Form 10-Q set forth above in Paragraph 216 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and

depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

218.    The Q2 2014 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q2 2014 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### HH.    April 30, 2014 – Q3 2014 Press Release

219.    On April 30, 2014, the Company issued a press release disclosing its third quarter 2014 financial results (the "Q3 2014 Press Release"), announcing "The company's third-quarter revenues grew to $34.9 million, a 32 percent gain from $26.5 million in the third quarter of fiscal 2013."

220.    The statements from the Q3 2014 Press Release set forth above in Paragraph 219 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**II.      April 30, 2014 – Q3 2014 Earnings Call**

221.    On April 30, 2014, CSI held a conference call with analysts to discuss the Company's third quarter of fiscal year 2014 earnings (the Q3 2014 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to a year ago, total revenues grew 32% to $34.9 million" and CSI "sold nearly 10,000 devices."

222.    The statements from the Q3 2014 Earnings Call set forth above in Paragraph 221 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**JJ.** **May 8, 2014 – Q3 2014 Form 10-Q**

223.    On May 8, 2014, the Company filed its Form 10-Q Quarterly Report for the third quarter of fiscal year 2014 with the SEC (the "Q3 2014 Form 10-Q"). The Q3 2014 Form 10-Q was signed by Martin and Betterley.

224.    The Q3 2014 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2014** | **2013** |
| Revenues | $ 34,945 | $ 26,474 |
| Cost of goods sold | 7,749 | 6,241 |
| Gross Profit | 27,196 | 20,233 |
| Expenses: | | |
| Selling, general and administrative | 31,428 | 21,650 |
| Research and development | 5,361 | 3,993 |
| Total expenses | 36,789 | 25,643 |
| Loss from operations | (9,593) | (5,410) |
| Interest and other, net | (119) | (809) |
| Net loss and comprehensive loss | (9,712) | (6,219) |

225.    The statements from the Q3 2014 Form 10-Q set forth above in Paragraph 224 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-

customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

226.   The Q3 2014 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q3 2014 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

### KK.   May 9, 2014 – Notice of Department of Justice Investigation

227.   On May 9, 2014, the Company disclosed, in a Form 8-K Current Report signed by Martin and Betterley (the "May 9, 2014 Form 8-K"), that it received notice that the DOJ was investigating the Company "to determine whether the Company has violated the False Claims Act, resulting in the submission of false claims to federal and state health care programs, including Medicare and Medicaid."  The notice attached a Civil Investigative Demand ("CID") for written interrogatories and document requests that the Company was required to respond to.

228.   In the May 9, 2014 Form 8-K, the Company continued to represent that it "maintains rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements, and is working with the U.S. Attorney's Office to promptly respond to the CID."

229.    The statements from the May 9, 2014 Form 8-K set forth above in Paragraphs 227 and 228 were materially false and misleading because they did not disclose that the Company was, in fact, not in compliance with applicable laws, including the AKS and False Claim Act, or the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### LL.    August 6, 2014 – Q4 2014 Press Release

230.    On August 6, 2014, the Company issued a press release disclosing its fourth quarter 2014 financial results (the "Q4 2014 Press Release"), announcing CSI "fourth-quarter revenues grew to $39.6 million, a 37 percent gain from $28.8 million in the fourth quarter of fiscal 2013."

231.    The statements from the Q4 2014 Press Release set forth above in Paragraph 230 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**MM.   August 6, 2014 – Q4 2014 Earnings Call**

232.   On August 6, 2014, CSI held a conference call with analysts to discuss the Company's fourth quarter of fiscal year 2014 earnings (the "Q4 2014 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to a year ago, total revenues grew 37% to $39.6 million" and CSI "sold over 11,000 devices."

233.   The statements from the Q4 2014 Earnings Call set forth above in Paragraph 232 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

**NN.   August 28, 2014 – Fiscal Year 2014 Annual Report**

234.   On August 28, 2014, CSI filed its Form 10-K Annual Report for the fiscal year ended June 30, 2014 with the SEC (the "2014 Form 10-K").  Betterley and Martin signed the 2014 Form 10-K.

235.   The 2014 Form 10-K also acknowledged and discussed the applicability of the FDCA, federal Anti-Kickback Statute, and False Claims Act to the Company:

> Our operations will be directly, or indirectly through our customers, subject to various state and federal fraud and abuse laws, including, without limitation, the FDCA, federal

Anti-Kickback Statute and False Claims Act. These laws may impact, among other things, our proposed sales, marketing, and education programs. In addition, these laws require us to screen individuals and other companies, suppliers and vendors in order to ensure that they are not "debarred" by the federal government and therefore prohibited from doing business in the healthcare industry.

The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as the Medicare and Medicaid programs. Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated. The Anti-Kickback Statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry. Many states have also adopted laws similar to the federal Anti-Kickback Statute, some of which apply to the referral of patients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.

The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Various states have also enacted laws modeled after the federal False Claims Act.

236.    In addition to the above, the 10-K also stated, in a paragraph discussing the DOJ's investigation into its sales practices, that "[w]e maintain rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements."

237.    The statements from the 2014 Form 10-K set forth above in Paragraphs 235 and 236 were materially false and misleading because they did not disclose that the

Company was, in fact, not in compliance with applicable laws, including the AKS and

False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal

CSI documents and former employees, the Company engaged in illegal sales tactics,

including entering into *quid pro quo* arrangements with physician-customers by offering

to generate patient referrals for these customers in exchange for their purchases of CSI

products.

238.   The 2014 Form 10-K  disclosed results of operations expressed as dollar

amounts (in thousands) as follows:

| | **Year Ended June 30,** | |
|---|---|---|
| | **2014** | **2013** |
| Revenues | $    136,612 | $    103,897 |
| Cost of goods sold | 31,041 | 24,382 |
| Gross profit | 105,571 | 79,515 |
| Gross margin | 77.3% | 76.5% |
| Expenses: | | |
| Selling, general and administrative | 117,994 | 86,718 |
| Research and development | 21,066 | 15,216 |
| Total expenses | 139,060 | 101,934 |
| Loss from operations | (33,489) | (22,419) |
| Interest and other, net | (1,801) | (1,618) |
| Net loss | (35,290) | (24,037) |

239.   The statements from the 2014 Form 10-K set forth above in Paragraph 238

were materially false and misleading because they did not disclose the fact that revenues

from the sales of the Company's PAD Devices were artificially inflated by and depended

on CSI engaging in systemic, unsustainable violations of applicable laws, including the

AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by

internal CSI documents and former employees, the Company engaged in illegal sales

tactics, including entering into *quid pro quo* arrangements with physician-customers by

offering to generate patient referrals for these customers in exchange for their purchases

of CSI products.

240.     The 2014 Form 10-K was accompanied by signed certifications, as required

by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the 2014

Form 10-K "does not contain any untrue statement of a material fact or omit to state a

material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading" and that "the financial statements, and

other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant."

### OO.   October 29, 2014 – Q1 2015 Press Release

241.     On October 29, 2014, the Company issued a press release disclosing its first

quarter 2015 financial results (the "Q1 2015 Press Release"), stating that CSI's "first-

quarter revenues increased 39 percent to $41.4 million, from $29.8 million in the first

quarter of fiscal 2014."

242.     The statements from the Q1 2015 Press Release set forth above in

Paragraph 241 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws,

including the AKS and False Claim Act, and the Company's Code of Ethics, because, as

confirmed by internal CSI documents and former employees, the Company engaged in

illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

243. The Q1 2015 Press Release included a statement by Martin regarding the reason for the Company's sales growth:

> Our robust sales growth is driven by market expansion for treatment of both peripheral and coronary artery disease, as a growing number of physicians embrace our technology to solve their most difficult interventional vascular challenges—specifically calcified lesions.   Treating these patients has historically led to higher rates of adverse events and retreatment, resulting in higher costs.

244. The statements from the Q1 2015 Press Release set forth above in Paragraph 243 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

245. This was the Company's first quarter following the disclosure of the DOJ investigation and as part of the Q1 2015 Press Release, Martin highlighted a new initiative to "optimiz[e] [its] sales force."

246.    The statements from the Q1 2015 Press Release in Paragraph 245 above were materially false and misleading when made because Martin did not disclose that the Company's sales force optimization plan involved ceasing the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

247.    The effect of CSI's illegal conduct on its share price is made clear by the increase in expenses and sharp decline in revenues the Company experienced after the sales force optimization.  It was unknown to investors at the time of the announcement, but without the advantage of relying on entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, CSI's financial results would consistently disappoint throughout the remainder of the Class Period, leading to significant damage to the Class.

**PP.    October 29, 2014 – Q1 2015 Earnings Call**

248.    On October 29, 2014, CSI held a conference call with analysts to discuss the Company's first quarter of fiscal year 2015 earnings (the "Q1 2015 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to a year ago, total revenues grew 39% to $41.4 million" and CSI "sold over 11,500 devices."

249.    The statements from the Q1 2015 Earnings Call set forth above in Paragraph 248 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by

and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### QQ.   November 7, 2014 – Q1 2015 Form 10-Q

250.   On November 7, 2014, the Company filed its Form 10-Q Quarterly Report for the first quarter of fiscal year 2015 with the SEC (the "Q1 2015 Form 10-Q").  The Q1 2015 Form 10-Q was signed by Martin and Betterley.

251.   The Q1 2015 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

| | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| | **2014** | | **2013** |
| Revenues | $ | 41,354 | $          29,766 |
| Cost of goods sold | | 8,885 | 6,864 |
| Gross Profit | | 32,469 | 22,902 |
| Expenses | | | |
| Selling, general and administrative | | 33,507 | 25,371 |
| Research and development | | 7,152 | 4,378 |
| Total expenses | | 40,659 | 29,749 |
| Loss from operations | | (8,190) | (6,847) |
| Interest and other, net | | (34) | (445) |
| Net loss and comprehensive loss | | (8,224) | (7,292) |

252.   The statements from the Q1 2015 Form 10-Q set forth above in Paragraph 251 were materially false and misleading because they did not disclose the fact that

revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

253.    The Q1 2015 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q1 2015 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

**RR.   January 28, 2015 – Q2 2015 Press Release**

254.    On January 28, 2015, the Company issued a press release disclosing its second quarter 2014 financial results (the "Q2 2015 Press Release"), announcing CSI's "second-quarter revenues increased 38 percent to $44.7 million, from $32.3 million in the second quarter of fiscal 2014."

255.    The statements from the Q2 2015 Press Release set forth above in Paragraph 254 were materially false and misleading because they did not disclose the fact

that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

### SS.   January 28, 2015 – Q2 2015 Earnings Call

256.   On January 28, 2015, CSI held a conference call with analysts to discuss the Company's second quarter of fiscal year 2015 earnings (the "Q2 2015 Earnings Call").  Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to last year's second quarter total revenues grew 38% to $44.7 million" and CSI "sold nearly 13,000 devices."

257.   The statements from the Q2 2015 Earnings Call set forth above in Paragraph 256 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

258.    On the Q2 2015 Earnings Call, Martin stated that the Company "expanded our sales force."

259.    The statements from the Q2 2015 Earnings Call in Paragraph 258 above were materially false and misleading when made because Martin did not disclose the fact that the sales force expansion was required because the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

**TT.    February 6, 2015 – Q2 2015 Form 10-Q**

260.    On February 6, 2015, the Company filed its Form 10-Q Quarterly Report for the second quarter of fiscal year 2015 with the SEC (the "Q2 2015 Form 10-Q").  The Q2 2015 Form 10-Q was signed by Martin and Betterley.

261.    The Q2 2015 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended December 31, | |
| --- | --- | --- |
|  | **2014** | **2013** |
| Revenues | $      44,732 | $      32,337 |
| Cost of goods sold | 9,346 | 7,313 |
| Gross Profit | 35,386 | 25,024 |
| Expenses | | |
| Selling, general and administrative | 32,553 | 27,468 |
| Research and development | 8,085 | 5,051 |
| Total expenses | 40,638 | 32,519 |
| Loss from operations | (5,252) | (7,495) |
| Interest and other, net | (21) | (1,163) |
| Net and comprehensive loss | (5,273) | (8,658) |

262.    The statements from the Q2 2015 Form 10-Q in Paragraph 261 above were materially false and misleading when made because they did not disclose the fact that the increased expenses for the sales force optimization plan was required because the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

263.    The Q2 2015 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q2 2015 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant."

**UU.    April 29, 2015 – Q3 2015 Press Release**

264.    On April 29, 2015, the Company issued a press release disclosing its third quarter 2015 financial results (the "Q3 2015 Press Release").

265.    The Q3 2015 Press Release reported significant losses for the Company, due, in part, to "sales force expansion."  Specifically, the Company reported the following figures:

CSI's fiscal 2015 third-quarter net loss was $(10.7) million, or $(0.34) per common share, compared to a net loss of $(9.7) million, or $(0.32) per common share, in the fiscal 2014 third quarter.  Net loss increased from the prior year primarily due to planned investments, including sales force expansion and coronary product commercialization.

266.    The statements from the Q3 2015 Press Release in Paragraph 265 above were materially false and misleading when made because they did not disclose the fact that the increased expenses for the sales force optimization plan was required because the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

## VV.    April 29, 2015 – Q3 2015 Earnings Call

267.    On April 29, 2015, CSI held a conference call with analysts to discuss the Company's third quarter of fiscal year 2015 earnings (the "Q3 2015 Earnings Call"). Martin and Betterley participated in this call.  Betterley stated that "[c]ompared to last year's third quarter, total revenues grew 35% to $47 million" and CSI "sold over 13,000 devices."

268.    The statements from the Q3 2015 Earnings Call set forth above in Paragraph 267 were materially false and misleading because they did not disclose the fact that revenues from the sales of the Company's PAD Devices were artificially inflated by and depended on CSI engaging in systemic, unsustainable violations of applicable laws, including the AKS and False Claim Act, and the Company's Code of Ethics, because, as

confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

269.   On the Q3 2015 Earnings Call, Martin stated that the Company's plan to "expand[] the sales force . . . from 160 members [to] 250," and that the reason for this sales force expansion was because "there are so many patients in need with coronary calcium or peripheral calcium . . .  We can't—we literally can't get to all those patients and we've, one, expanded the sales force . . .  In addition, we're going to train each one of those to handle both franchises."

270.   The statements from the Q3 2015 Earnings Call in Paragraph 269 above were materially false and misleading when made because Martin did not disclose the fact that the sales force expansion was required because the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

**WW.  May 8, 2015 – Q3 2015 Form 10-Q**

271.   On May 8, 2015, the Company filed its Form 10-Q Quarterly Report for the third quarter of fiscal year 2015 with the SEC (the "Q3 2015 Form 10-Q").  The Q3 2015 Form 10-Q was signed by Martin and Betterley.

272.   The Q3 2015 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2015** | **2014** |
| Revenues | $ 47,004 | $ 34,945 |
| Cost of goods sold | 10,416 | 7,749 |
| Gross Profit | 36,588 | 27,196 |
| Expenses: | | |
| Selling, general and administrative | 39,354 | 31,428 |
| Research and development | 7,777 | 5,361 |
| Total expenses | 47,131 | 36,789 |
| Loss from operations | (10,543) | (9,593) |
| Interest and other, net | (113) | (119) |
| Net loss | (10,656) | (9,712) |

273.    The statements from the Q3 2015 Form 10-Q in Paragraph 272 above were materially false and misleading when made because they did not disclose that the increased expenses from the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

274.    The Q3 2015 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q3 2015 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and "the financial statements, and other financial information included in this report, fairly present

in all material respects the financial condition, results of operations and cash flows of the registrant."

**XX.**   **August 5, 2015 – 4Q 2015 Press Release**

275.   On August 5, 2015, the Company issued a press release disclosing its fourth quarter 2015 financial results (the "Q4 2015 Press Release").

276.   The Q4 2015 Press Release reported significant losses again for the Company.  Specifically, the Company reported the following figures for the fourth quarter 2015:

> Net loss was $(8.7) million, or $(0.27) per common share, compared to a net loss of $(9.6) million, or $(0.31) per common share, in the fiscal 2014 fourth quarter.  Adjusted EBITDA loss improved to $(4.1) million compared to $(5.9) million a year earlier.

277.   The statements from the Q4 2015 Form 10-Q in Paragraph 276 above were materially false and misleading when made because they did not disclose that the net losses stemming from the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

278.   The Q4 2015 Press Release listed the Company's unaudited consolidated statements of operations showing that the primary reason for the net loss was the Company's $38.3 million in selling, general and administrative expenses for the fourth quarter of fiscal year 2015.

279.    The statements from the Q4 2015 Form 10-Q in Paragraph 278 above were materially false and misleading when made because they did not disclose that the increase to the Company's selling, general, and administrative expenses was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

280.    The Company attributed the losses, in part, to the Company's "sales force expansion" strategy, which fell short of targets.  The Q4 2015 Press Release, quoting Martin, stated the following regarding the Company's sales force optimization and its shortcomings:

> Significant progress continued on our sales optimization plan in the fourth quarter.  Cross training of our sales force to sell both peripheral and coronary products advanced with over 140 representatives now trained.  Productivity goals were also achieved per representative, further validating that our dual application sales approach will provide attractive growth and lead to profitability in the future.  The related sales force expansion, however, fell short of our targets, resulting in an average of approximately 9 open positions during the quarter. As a consequence, revenue was slightly below our expectations.  We have taken actions to reach our planned sales force level by the end of the fiscal 2016 first quarter and beyond.

281.    The statements from the Q4 2015 Form 10-Q in Paragraph 280 above were materially false and misleading when made because they did not disclose that the sales force optimization plan was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid*

*pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

**YY.    August 27, 2015 – Fiscal Year 2015 Annual Report**

282.    On August 27, 2015, CSI filed its Form 10-K Annual Report for the fiscal year ended June 30, 2015 with the SEC (the "2015 Form 10-K").  Betterley and Martin signed the 2015 Form 10-K.

283.    The 2015 Form 10-K also acknowledged and discussed the applicability of the FDCA, federal Anti-Kickback Statute, and False Claims Act to the Company:

> Our operations are directly, or indirectly through our customers, subject to various state and federal fraud and abuse laws, including, without limitation, the FDCA, federal Anti-Kickback Statute and False Claims Act.  These laws may impact, among other things, our proposed sales, marketing, and education and clinical programs.  In addition, these laws require us to screen individuals and other companies, suppliers and vendors in order to ensure that they are not "debarred" by the federal government and therefore prohibited from doing business in the healthcare industry.
>
> The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal healthcare program such as the Medicare and Medicaid programs.  Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated.  The Anti-Kickback Statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the healthcare industry.  Many states have also adopted laws similar to the federal Anti-

Kickback Statute, some of which apply to the referral of patients for healthcare items or services reimbursed by any source, not only the Medicare and Medicaid programs.

The federal False Claims Act prohibits persons from knowingly filing or causing to be filed a false claim to, or the knowing use of false statements to obtain payment from, the federal government. Various states have also enacted laws modeled after the federal False Claims Act.

284.   In addition to the above, the 10-K also stated, in a paragraph discussing the DOJ investigation into its sales practices, that "[w]e maintain rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements."

285.   The statements from the 2015 Form 10-K set forth above in Paragraphs 283 and 284 were materially false and misleading because they did not disclose that the Company was, in fact, not in compliance with applicable laws, including the AKS and False Claim Act, or the Company's Code of Ethics, because, as confirmed by internal CSI documents and former employees, the Company engaged in illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

286.   The 2015 Form 10-K disclosed results of operations expressed as dollar amounts (in thousands) as follows:

| | Year Ended June 30, | |
| --- | --- | --- |
| | **2015** | **2014** |
| Revenues | $       181,544 | $       136,612 |
| Cost of goods sold | 39,520 | 31,041 |
|    Gross profit | 142,024 | 105,571 |
|    Gross margin | 78.2% | 77.3% |
| Expenses: | | |
| Selling, general and administrative | 143,684 | 117,994 |
| Research and development | 30,977 | 21,066 |
|    Total expenses | 174,661 | 139,060 |
|    Loss from operations | (32,637) | (33,489) |
| Interest and other, net | (185) | (1,801) |
|    Net loss | (32,822) | (35,290) |

287.    The statements from the 2015 Form 10-K in Paragraph 286 above were materially false and misleading when made because they did not disclose that the increased expenses from the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

288.    The 2015 Form 10-K was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the 2014 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and that "the financial statements, and

other financial information included in this report, fairly present in all material respects

the financial condition, results of operations and cash flows of the registrant."

### ZZ.    October 7, 2015 – Q1 2016 Press Release

289.    On October 7, 2015, the Company issued a press release announcing

preliminary first quarter financial results for the 2016 fiscal year for the Company (the

"Q1 2016 Press Release").

290.    This was the first earnings quarter after *Qui Tam* Action was unsealed and

the Q1 2016 Press Release revealed that revenue fell from $48.5 million the prior quarter

to $43.9 million in the first quarter of 2016.

291.    The Q1 2016 Press Release again reported significant losses again for the

Company.  Specifically, the Company reported the following figures for the first quarter

2016:

> The fiscal 2016 first quarter net loss is anticipated to be in the
> range of $(13.1) million to $(13.9) million, or $(0.41) to
> $(0.43) per common share, compared to a net loss of $(8.2)
> million, or $(0.26) per common share, in the fiscal 2015 first
> quarter.

292.    The statements from the Q1 2016 Press Release in Paragraphs 290 and 291

above were materially false and misleading when made because they did not disclose that

the net losses stemming from the Company's expansion of its sales and marketing

organization was necessary to maintain sales of its PAD Devices after the Company

ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo*

arrangements with physician-customers by offering to generate patient referrals for these

customers in exchange for their purchases of CSI products, that CSI relied on for its sales

revenue.

293.    The Q1 2016 Press Release, quoting Martin, stated the following about the

Company's sales force optimization:

> We continued to make progress on our sales optimization
> strategy to significantly expand our sales organization, while
> cross training representatives to sell both peripheral and
> coronary applications.   However, as our recent results
> suggest, **some aspects of the transition have been
> challenging.**  After a thorough review, we believe we have
> taken the right steps to address the immediate challenges and
> continue to expect the vast majority of the optimization effort
> to be completed by the third quarter of this fiscal year.  We
> see no change in our multi-billion market opportunity, or our
> potential to address it.   Our unique orbital atherectomy
> technology is groundbreaking, addressing the large
> population of underserved patients with calcified artery
> disease.    We believe our sales optimization strategy,
> including a large focused sales force, is the ideal approach to
> capitalize on this opportunity and drive attractive double digit
> revenue growth and profitability in the future.

294.    The statements from the Q1 2016 Press Release in Paragraph 293 above

were materially false and misleading when made because they did not disclose that the

Company's sales force optimization involved ceasing the prior sales practices of illegal

kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by

offering to generate patient referrals for these customers in exchange for their purchases

of CSI products, that CSI relied on for its sales revenue.

### AAA.  <u>November 4, 2015 – Q1 2016 Earnings Call</u>

295.    On November 4, 2015, CSI held a conference call with analysts to discuss

the Company's first quarter of fiscal year 2016 earnings (the "Q1 2016 Earnings Call").

Martin and Betterley participated in this call.  Betterley stated that "[o]perating expenses rose 19% over last year, primarily from planned investments related to sales force optimization and expansion."

296.    In direct response to an analyst's questions about the sales force "disruption" and "turnover," Martin stated:

> First, our communication is intensified with really key audiences—our sales management team, our faculty, our field sales trainers, our overall sales teams.  So we've increased communication. We've got something great to —some small territories, no travel, the ability to get intimate with customers in your home town and make home-town heroes.  It's a great story that might have been lost last year in some aggressive quota setting and the related compensation divot for some of our sales people. We have addressed that since October 1. Morale is high. . . .  So yes, things are on the move and we're feeling great about it.

297.    The statements from the Q1 2016 Earnings Call in Paragraphs 295 and 296 above were materially false and misleading when made because the Company did not disclose the fact that the sales force expansion was required because the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

**BBB.  November 6, 2015 – 1Q 2016 Form 10-Q**

298.    On November 6, 2015, the Company filed its Form 10-Q Quarterly Report for the first quarter of fiscal year 2016 with the SEC (the "Q1 2016 Form 10-Q").  The Q1 2016 Form 10-Q was signed by Martin and Betterley.

299.   The Q1 2016 Form 10-Q disclosed the Company's results of operations expressed as dollar amounts (in thousands) as follows:

|  | Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
|  | **2015** | | **2014** | |
| Revenues | $ | 43,871 | $ | 41,354 |
| Cost of goods sold | | 8,771 | | 8,885 |
| Gross Profit | | 35,100 | | 32,469 |
| Expenses | | | | |
| Selling, general and administrative | | 41,395 | | 33,507 |
| Research and development | | 6,941 | | 7,152 |
| Total expenses | | 48,336 | | 40,659 |
| Loss from operations | | (13,236) | | (8,190) |
| Interest and other, net | | (25) | | (34) |
| Net loss | | (13,261) | | (8,224) |

300.   The statements from the Q1 2016 Form 10-Q in Paragraph 299 above were materially false and misleading when made because they did not disclose that the increased expenses from the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

301.   The Q1 2016 Form 10-Q was accompanied by signed certifications, as required by the Sarbanes-Oxley Act of 2002, by Martin and Betterley, who certified that the Q1 2016 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading" and "the

financial statements, and other financial information included in this report, fairly present

in all material respects the financial condition, results of operations and cash flows of the

registrant."

### CCC. __January 21, 2016 – Q2 2016 Press Release and Earnings Call__

302.    On January 21, 2016, the Company issued a press release disclosing its

second quarter fiscal 2016 financial results (the "Q2 2016 Press Release").

303.    The Q2 2016 Press Release again reported significant losses for the

Company.  Specifically, the Company reported the following figures for the first quarter

2016:

> Net loss was $(15.2) million, or $(0.47) per common share,
> compared to a net loss of $(5.3) million, or $(0.17) per
> common share, in the fiscal 2015 second quarter.  Adjusted
> EBITDA loss was $(11.1) million versus $(1.3) million a year
> earlier.

304.    The statements from the Q2 2016 Press Release in Paragraph 303 above

were materially false and misleading when made because they did not disclose that the

net losses stemming from the Company's expansion of its sales and marketing

organization was necessary to maintain sales of its PAD Devices after the Company

ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo*

arrangements with physician-customers by offering to generate patient referrals for these

customers in exchange for their purchases of CSI products, that CSI relied on for its sales

revenue.

305.    The Q2 2016 Press Release reported revenue of only $41.4 million, below the Company's prior revenue guidance of between $42.5 million and $44.0 million.  The Company attributed the guidance miss to the "continued effects of the sales force transition."

306.    The statements from the Q2 2016 Press Release in Paragraph 305 above were materially false and misleading when made because they did not disclose that the increased expenses from the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

307.    Addressing the Company's first quarter fiscal 2016 financial results, Scott Ward, the Company's Chairman and Interim Chief Executive Officer,[8] stated in relevant part:

> CSI's sales force expansion and implementation of a dual franchise model, selling both coronary and peripheral applications, has been challenging and is affecting our near term sales performance.  We have gained meaningful insights during the transition and we are encouraged by recent progress.  The sales organization continues to gain valuable experience and we have begun to adjust our sales model at the local level, adopting a more flexible approach where warranted.

---

[8] Scott Ward was appointed Interim Chief Executive Officer effective December 1, 2015 as a result of Martin taking a medical leave of absence.

308.   During a conference call with analysts on the same day, Ward again attributed the sales force disruption to a change to a dual-franchise strategy, stating, "[t]he rapid expansion of our sales force and the implementation of a dual franchise strategy has been a major undertaking, and the related disruption has negatively affected our sales performance."

309.   The statements from the Q2 2016 Press Release in Paragraphs 307 and 308 above were materially false and misleading when made because they did not disclose that the Company's expansion of its sales and marketing organization was necessary to maintain sales of its PAD Devices after the Company ceased the prior sales practices of illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, that CSI relied on for its sales revenue.

310.   Benchmark analysts reported skepticism on the Company's ability to turn-around its revenue losses, stating in a January 22, 2016 report, "[t]he company's past predictions have not been accurate, and at this point it may be better to wait until success is demonstrated before stepping in or adding to positions."

### DDD.  **Defendants' Wrongful Conduct**

311.   Each of the statements by CSI referenced above, was materially incomplete, false and misleading as to the Company's business, operations, and prospects.

312.   Specifically, Defendants knowingly or recklessly made and/or caused to be made materially incomplete, false and misleading statements of fact by leading the

investing public to believe that the Company complied with applicable laws and regulations governing the marketing and sale of its PAD Devices and failing to disclose that (1) the Company relied upon illegal sales tactics, including entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, and (2) the Company's unlawful sales tactics forced the Company to initiate a retraining program that cost the Company millions of dollars and led to multiple negative earnings periods.  These facts pertained to the Company's business, operations, and prospects and were known to Martin and Betterley or recklessly disregarded by them.  Martin and Betterley knowingly or recklessly made and/or caused to be made materially incomplete, false and misleading statements of fact and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced.

## IX.   LOSS CAUSATION/ECONOMIC LOSS

313.   Throughout the Class Period, CSI's stock price was artificially inflated as a result of Defendants' false and misleading statements and omissions that created the false impression that CSI's sales strategy was legal and complaint, when in fact, it was heavily reliant on illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products.

314.   Multiple separate disclosures on these topics revealed to the market on a piecemeal basis the false and misleading character of Defendants' statements and omissions.  These corrective disclosures, which occurred between May 9, 2014 and

January 21, 2016, caused significant drops in the Company's stock price. By January 22, 2016, the day after the Class Period, CSI's stock had plunged precipitously from its Class Period high of $40.98 per share on April 9, 2015 to $8.74 per share, a drop of nearly 80%. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and the Class.

315.    On May 9, 2014, after years of CSI representing that its revenues were stable and growing, its business was fully compliant with the law, and that its sales practices were ethical and legal, CSI disclosed in a Form 8-K filed with SEC that it had received notice from the U.S. Attorney for the Western District of North Carolina that the Company was the subject of an investigation "to determine whether the Company has violated the False Claims Act, resulting in the submission of false claims to federal and state health care programs, including Medicare and Medicaid."

316.    In response to this unexpected announcement, the price of CSI shares declined $2.51 per share, or over 8%, from an opening of $29.94 per share on May 12, 2014 (the next trading day), to close at $27.43 per share that day.

317.    However, the May 9, 2014 disclosure did not reveal the full truth to investors, and Defendants continued to mislead investors about CSI's historical reliance on illegal sales tactics, thus preventing the market from learning the full extent of Defendants' exposure to further revelations concerning its illegal sales practices. Specifically, in the very same Form 8-K disclosing the government investigation, the Company continued to represent that it "maintains rigorous policies and procedures to promote compliance with the False Claims Act and other regulatory requirements." CSI

also failed to disclose that as a result of the *Qui Tam* Action and DOJ investigation, it had

been forced to end illegal sales practices and commence a thorough reform of its sales

organization, including by purging it of the individuals who had presided over those

practices.  As discussed below, further revelations concerning these activities would

cause CSI's stock to plummet over the coming year and half.

318.   In the wake of the increased scrutiny resulting from the *Qui Tam* Action

and DOJ investigation, Defendants' illegal sales tactics had to subside.  To make for this

drop-off in illegally-generated revenues, CSI had to engage in a massive sales force

restructuring and "optimization," which required the hiring of numerous additional sales

reps.  Indeed, according to Jim Breidenstein's sworn deposition testimony from the

Babyak Action, CSI was engaged in a massive hiring drive throughout the first half of

calendar year 2015.  Specifically, Breidenstein testified that during this time, "all areas[]

were hiring additional regional sales managers." Ex. 10 at 53.  When asked whether this

hiring drive was a part of the announced sales force reforms, Breidenstein stated, "[y]es,

optimization, growth," and added that new sales force middle management, in particular

Regional Sales Managers—who were responsible for implementing management's broad

sales strategies—"were needed throughout the United States."  *Id.* at 52.

319.   In the fiscal third quarter of 2015, the financial consequences of the drop-

off in illegal activity started to become apparent in CSI's financial results.  On April 29,

2015, CSI reported significant losses for the Company—disclosing increased net losses

of $10.7 million and increased SG&A expenses of $39.5 million.  In discussing the

increased losses, CSI expressly linked them to the "sales force expansion" that it had

been forced to conduct because it could no longer rely on illegal tactics to drive sales. With this announcement, some of the artificial inflation caused by Defendants' misstatements was removed, thereby causing damage to Lead Plaintiffs and other members of the Class. Specifically, the price of Company's stock fell $4.88, or 14%, over the next two trading days on larger than normal volume, from a close of $34.82 on April 29, 2015, to a close of $29.94 on May 1, 2015.

320.    On August 5, 2015, the Company revealed disappointing financial results for fiscal fourth quarter of 2015—disclosing that revenues were $48 million, which was below consensus expectations of $50.1 million. Again, CSI—specifically CEO Martin— expressly linked the disappointing revenue figures to problems with CSI's sales, noting that the "sale force expansion . . . fell short of our targets [and] [a]s a consequence, revenue was slightly below our expectations." Further, Martin stated explicitly during an earnings call held the same day that "PAD revenue growth is also temporarily affected by our sales optimization." As discussed above, these sales force reforms were being implemented to address the drop-off in the Company's reliance on the illegal sales practices alleged herein. The next day, the price of the Company's stock plummeted $6.13, or 21%, on volume nearly 15 times larger than the 10-day average, from a close of $29.35 on August 5, 2015, to a close of $23.22 on August 6, 2015.

321.    On October 7, 2015, the Company again announced greater than expected losses for the fiscal 2016 first quarter—with net losses "anticipated to be in the range of $(13.1) million to $(13.9) million" compared to significantly lower losses for the same quarter in the preceding fiscal year. These losses were yet again attributed to

"challeng[es]" in CSI's sales force "optimization" program.  In particular, Martin stated

on an earnings call with analysts that "we have been evolving our sales organization . . .

this has been highly disruptive to our sales organization for these past two quarters."

Attempting to reassure investors, Martin added, "we've addressed the immediate

challenges related to our sales optimization strategy and we've positioned our salesforce

for future success."  In reaction to the Company's announcement of disappointing

financial results relating to the fraudulent and illegal practices alleged herein, as set forth

above, the price of the Company's common stock plummeted $3.01 or 18%, from a close

of $16.63 on October 7, 2015, to a close of $13.62 on October 8, 2015.

322.    Finally, on January 21, 2016, CSI revealed that, contrary to prior

reassurances, sales force issues persisted, causing revenues to fall to $41 million—the

lowest level in more than a year, 3% below guidance, 4% below the second quarter of

fiscal 2015, and a nearly 6% decline from the prior quarter.  On the same day, interim

CEO Scott Ward again tied these declines to sales troubles, stating in a press release that

"CSI's sales force expansion . . . has been challenging and is affecting our near term sales

performance."  Ward also stated during a same day earnings call that "we continue to see

some challenges in our sales force expansion," and that "[t]he rapid expansion of our

sales force and the implementation of a dual franchise strategy has been a major

undertaking, and the related disruption has negatively affected our sales performance."

As discussed above, CSI needed to engage in a "rapid expansion" of its salesforce

because the removal of illegal inducements had lowered individual sales-people's ability

to generate more sales.  In reaction to the Company's announcement of disappointing

financial results relating to the fraudulent and illegal practices alleged herein, as set forth above, the price of Company shares declined $3.72 per share, or nearly 30%, from a close of $12.46 per share on January 21, 2016, to close at $8.74 per share on January 22, 2016.

323.    During the Class Period, Defendants engaged in a course of conduct which artificially inflated the price of CSI's common stock by misrepresenting the nature of its business strategy and the stability and growth of its revenues, and failing to disclose that CSI sold its PAD Devices using illegal kickbacks.  Later, as the Company's misconduct was disclosed to the market, the prices of CSI's common stock fell as the prior artificial inflation dissipated from the market price of the stock.  As a result of their purchases of the Company's common stock during the Class Period, Co-Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  For purposes of alleging loss causation, the price decline in CSI common stock, as detailed herein, was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market, as follows:

324.    Each of the declines in the Company's stock price discussed above was statistically significant at a high level after taking into account changes on the same days in the overall securities market and in relevant industry indices.  Furthermore, as set forth above, each of the price declines in CSI's stock is attributable to the disclosure of previously concealed information relating to the materially false and misleading statements and omissions alleged herein.  The timing and magnitude of CSI's stock price declines negate any inference that the losses suffered by Plaintiffs and other Class members were caused by other changed market conditions, macroeconomic or industry

factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  As the truth about Defendants' fraud was revealed, the Company's common stock price declined, the artificial inflation came out of the price of the common stock, and Plaintiffs and other members of the Class suffered damages.

325.    Indeed, based on the declines in revenues that the Company suffered in the wake of various partial corrective disclosures, including the announcement of the DOJ investigation, it appears that sales directly attributable to illegal activities can be estimated to amount to approximately *15%* of CSI's total revenues—if not higher.  For example, from the Class Period high of $48.5 million in revenues for the fourth quarter of fiscal 2015, revenues declined over the subsequent two quarters by more than $8 million, as the Company's results declined due to the abandonment of its illegal sales practices.

## X.    CLASS ACTION ALLEGATIONS

326.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired CSI common stock during the Class Period. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of CSI during the Class Period; (iv) any firm, trust, corporation or other entity in which any Defendant has or had a controlling interest; (v) CSI's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

327.    The members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's Fiscal Year 2015 Form 10-K Annual Report, filed with the SEC on August 27, 2015, CSI had more than 32 million shares of stock outstanding that actively traded on NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CSI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

328.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.

329.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

330.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omission as alleged herein;

(b)      whether statements made (or omissions) by Defendants to the

investing public during the Class Period misrepresented (or omitted) to state material

facts about CSI's business, in particular the Company's reliance upon illegal kickbacks,

such as entering into *quid pro quo* arrangements with physician-customers by offering to

generate patient referrals for these customers in exchange for their purchases of CSI

products, and other violations of applicable laws and regulations to drive sales of its

products, as well as the Company's operations and management;

(c)      whether the Defendants made their misstatements or

misrepresentations with the requisite scienter; and

(d)      the extent to which the members of the Class have sustained

damages and the proper measure of damages.

331.    A class action is superior to other available methods for the fair and

efficient adjudication of this controversy because, among other things, joinder of all

members is impracticable.  Furthermore, as the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.

There will be no difficulty in the management of this action as a class action.

## XI.    ADDITIONAL CONTROL PERSON ALLEGATIONS

332.    Martin and Betterley, because of their positions of control and authority as

senior executive officers, had access to the adverse, undisclosed information about CSI's

business and operations through their access to internal corporate documents and

information, conversations and associations with other corporate officers and employees,

attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

333.    Martin and Betterley, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels.  Martin and Betterley participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of its materially false and misleading nature.

334.    Martin and Betterley, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Martin and Betterley were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, Martin and Betterley are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

335.    As senior officers and controlling persons of a publicly held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, Martin and Betterley had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations

and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  Martin's and Betterley's wrongdoing during the Class Period violated these specific requirements and obligations.

336.    Betterley is liable as a primary participant in a wrongful course of conduct that operated as a fraud and deceit on purchasers of CSI's common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) regarding the Company's business and operations during the Class Period. The course of conduct: (i) deceived the investing public regarding CSI's operations and business, specifically that the Company relied upon illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, and other violations of applicable laws and regulations in order to drive sales of its product, and the true value of CSI's securities; and (ii) caused Lead Plaintiffs and other members of the Class to purchase CSI's securities at artificially inflated prices, which fell as the truth about CSI's business practices ultimately became known.

337.    In making the statements complained of herein, Martin and Betterley, who were senior officers and controlling persons of CSI, were acting on behalf of the Company in the regular course of business.  Therefore, each of the statements made by Martin and Betterley is attributable to the Company.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED *UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

338.  Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact which there was a duty to disclose.

339.  Lead Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding their reliance on illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, and other violations of applicable laws and regulations during the Class Period.

340.  Alternatively, Lead Plaintiffs are entitled to a presumption of reliance under the fraud on the market doctrine because at all relevant times, the market for CSI's securities was an efficient market for the following reasons, among others:

(a)  CSI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, CSI filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NASDAQ;

(c)  CSI regularly communicated with public investors through established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      CSI was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts at major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

341.    As a result of the foregoing, the market for CSI's securities promptly digested current information regarding CSI from all publicly available sources and reflected such information in CSI's stock price.  Under these circumstances, all purchasers of CSI's securities during the Class Period suffered similar injury through their purchase of CSI's securities at artificially inflated prices and a presumption of reliance applies.

## XIII.  INAPPLICABILITY OF STATUTORY SAFE HARBOR

342.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements or omissions pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, most of the identified false and

misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding CSI's practices.

343.    To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.  This includes, but is not necessarily limited to, the statements contained in Section VIII, *supra*.

344.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CSI who knew that those statements were false when made.

## XIV. <u>CAUSES OF ACTION</u>

### COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) <u>Promulgated Thereunder Against All Defendants</u>

345.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

346.    During the Class Period, CSI, Martin and Betterley carried out a course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase CSI securities

at artificially inflated prices.  In furtherance of this unlawful course of conduct, these

Defendants, and each of them, took the actions set forth herein.

347.  CSI, Martin and Betterley: (i) employed devices, schemes, and artifices to

defraud; (ii) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (iii) engaged in acts, practices, and

a course of business which operated as a fraud and deceit upon the purchasers of the

Company's securities in an effort to maintain artificially high market prices for CSI

common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All

Defendants are sued either as primary participants in the wrongful and illegal conduct

charged herein or as controlling persons.

348.  Martin and Betterley, individually and in concert, directly and indirectly, by

the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material

information about CSI's reliance upon illegal kickbacks, such as entering into *quid pro

quo* arrangements with physician-customers by offering to generate patient referrals for

these customers in exchange for their purchases of CSI products, and other violations of

applicable laws and regulations in order to drive sales of its product, as specified herein.

349.  The Defendants employed devices, schemes and artifices to defraud, while

in possession of material adverse non-public information, and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of CSI's value,

performance, and continued substantial growth, which included the making of, or the

participation in the making of, untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made about CSI's business,

specifically that the Company relied upon illegal kickbacks, such as entering into *quid*

*pro quo* arrangements with physician-customers by offering to generate patient referrals

for these customers in exchange for their purchases of CSI products, and other violations

of applicable laws and regulations in order to drive sales of its product, in the light of the

circumstances under which they were made, not misleading, as set forth more particularly

herein, and engaged in transactions, practices and a course of business that operated as a

fraud and deceit upon the purchasers of CSI's securities during the Class Period.

350. Betterley's primary liability arises from the following facts: (i) Betterley

was a high-level executive and/or director of the Company during the Class Period and

members of the Company's management team or had control thereof; (ii) Betterley, by

virtue of his responsibilities and activities as a senior officer of the Company was privy to

and participated in the creation, development and reporting of the Company's internal

budgets, plans, projections and/or reports, particularly with respect to the illegal

kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by

offering to generate patient referrals for these customers in exchange for their purchases

of CSI products, and other violations of applicable laws and regulations that the

Company relied upon in order to drive sales of its product; (iii) Betterley enjoyed

significant personal contact and familiarity with Martin and was advised of and had

access to other members of the Company's management team, internal reports and other

data and information about the Company's finances, operations, and sales at all relevant

times; (iv) Betterley was aware of the Company's dissemination of information to the

investing public which he knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading; and (v) Betterley signed certifications pursuant to the Sarbanes-Oxley Act of 2002 in CSI's annual and quarterly reports filed throughout the Class Period, which contained false and misleading statements of material fact.

351.    In addition to the duties of full disclosure imposed on Martin and Betterley as a result of making affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete and accurate information with respect to the Company's operations and performance so that the market prices of the securities would be based on truthful, complete and accurate information.

352.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true condition of CSI's business, specifically that the Company relied upon illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, in order to drive sales of its product, from the investing public and supporting the artificially inflated price of the Company's securities.  As demonstrated by

Defendants' misstatements throughout the Class Period, if Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

353.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CSI's securities was artificially inflated during the Class Period.  In ignorance of the fact that market price of CSI's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and the other members of the Class acquired CSI's securities during the Class Period at artificially high prices and were damaged when the value of their securities declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

354.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding CSI's business, specifically that the Company relied upon illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, in order to drive sales of its product, which were not disclosed by

Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CSI securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

355.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

356.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against Defendant Betterley

357.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

358.    Betterley acted as a controlling persons of CSI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, Betterley had the power to, and did, influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Betterley was provided with or had

unlimited access to copies of the Company's reports, press releases, public filings, and other statements regarding CSI's business, specifically that the Company relied upon illegal kickbacks, such as entering into *quid pro quo* arrangements with physician-customers by offering to generate patient referrals for these customers in exchange for their purchases of CSI products, and other violations of applicable laws and regulations in order to drive sales of its product, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

359.    Betterley had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

360.    As set forth above, CSI violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Betterley is liable pursuant to Section 20(a) of the Exchange Act as a control person of CSI, the primary violator.  As a direct and proximate result of Martin and Betterley's wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.  **PRAYER FOR RELIEF**

**WHEREFORE**, Lead Plaintiffs prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(b)  Awarding compensatory damages in favor of Lead Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## XVI. **JURY TRIAL DEMANDED**

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: June 27, 2017                      Respectfully submitted,

**LABATON SUCHAROW LLP**

By:  /s/ Michael W. Stocker
Michael W. Stocker
David J. Goldsmith
Alfred L. Fatale III
Ross M. Kamhi
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mstocker@labaton.com
        dgoldsmith@labaton.com
        afatale@labaton.com
        rkamhi@labaton.com

*Attorneys for Lead Plaintiffs Norfolk*

- 143 -

*County Retirement System and Wayne
County Employees' Retirement System and
Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

By: /s/   Jeremy P. Robinson
Jeremy P. Robinson
Angus Fei Ni
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jeremy@blbglaw.com
angus.ni@blbglaw.com

*Attorneys for Lead Plaintiff City of Miami
Fire Fighters' & Police Officers'
Retirement Trust and Co-Lead Counsel for
the Class*

**GUSTAFSON GLUEK PLLC**
Daniel E. Gustafson (#202241)
Daniel C. Hedlund (#258337)
David A. Goodwin (#386715)
Daniel J. Nordin (#392393)
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
E-mail: dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
dgoodwin@gustafsongluek.com
dnordin@gustafsongluek.com

*Liaison Counsel for Lead Plaintiffs Norfolk
County Retirement System and Wayne
County Employees' Retirement System*

**LOCKRIDGE GRINDAL NAUEN PLLP**
Richard A. Lockridge (#64117)
Gregg M. Fishbein (#202009)
Kate Baxter-Kauf (#0392037)
100 Washington Ave. S
Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 596-4044
Facsimile: (612) 339-0981
E-mail: ralockridge@locklaw.com
          gmfishbein@locklaw.com
          kmbaxter-kauf@locklaw.com

*Liaison Counsel for Lead Plaintiff City of Miami Fire Fighters' & Police Officers' Retirement Trust*