**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Sandra K. Shoemaker, individually and on behalf of all others similarly situated, | Civil No. 16-568 (DWF/KMM) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Cardiovascular Systems, Inc., and Laurence L. Betterley, | |
| Defendants. | |

Bryan L. Bleichner, Esq., and Jeffrey D. Bores, Esq., Chestnut Cambronne, PA; and Naumon A. Amjed, Esq., and Ryan T. Degnan, Esq., Kessler Topaz Meltzer & Check LLP, counsel for Plaintiff Sandra K. Shoemaker.

Angus Ni, Esq., and Jeremy Robinson, Esq., Bernstein Litowitz Berger & Grossmann LLP; Gregg M. Fishbein, Esq., Kate M. Baxter-Kauf, Esq., and Richard A. Lockridge, Esq., Lockridge Grindal Nauen PLLP; Alfred L. Fatale, III, Esq., and Ross M. Kamhi, Esq., Labaton Sucharow LLP; and David A. Goodwin, Esq., Gustafson Gluek PLLC, counsel for City of Miami Fire Fighters' & Police Officers' Retirement Trust.

David R. Marshall, Esq., and Leah C. Janus, Esq., Fredrikson & Byron, PA; and Michael C. Tu, Esq., Daniel Streim, Esq., and Robert M. Stern, Esq., Orrick, Herrington & Sutcliffe LLP, counsel for Defendants.

**INTRODUCTION**

The plaintiffs in this case are shareholders of a publicly traded, medical-device company that allegedly violated securities laws by making material misstatements regarding illegal kickbacks paid to doctors. This matter is before the Court on the

defendants' motion to dismiss.  For the reasons discussed below, the Court grants the defendants' motion.

## BACKGROUND

Cardiovascular Systems, Inc. ("CSI") is a publicly traded company that primarily develops and manufactures medical devices for the treatment of peripheral arterial disease and coronary artery disease.  Defendant Laurence Betterley has been CSI's Chief Financial Officer since April 2008.  David L. Martin, recently deceased, was CSI's CEO and one of its directors during the relevant time period.  Plaintiffs are shareholders of CSI who allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiffs seek to represent a class of shareholders who "purchased or otherwise acquired" CSI's common stock between September 12, 2011 and January 21, 2016.

## I.     Factual Background

Around 88% of CSI's business comes from the sale of devices used to treat peripheral arterial disease ("PAD").  PAD "typically refers to the chronic obstruction of the arteries supplying the lower extremities due to plaque deposition on the walls of the arteries resulting in inadequate blood flow to the limbs."  (Doc. Nos. 55-70 ("Luken Decl.") ¶ 11, Ex. 10 at 2.)

Medical devices are heavily regulated, including under the federal Anti-Kickback Statute ("AKS").[1]  The AKS is a criminal statute that prohibits, among other things,

---

[1]     42 U.S.C. § 1320a-7b.

"knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person" either to refer an individual to the person for medical services or to purchase any good that that will be repaid in whole or in part by a federal health care program.  42 U.S.C. § 1320a-7b(b)(2)(B).  In short, a violation of the AKS requires:  (1) a remuneration to a person or entity in a position either to purchase goods subject to reimbursement by a federal health care program or to refer a patient whose care will be reimbursed by a federal health care program; and (2) that the remuneration could reasonably induce such referral or such purchase.  *See Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015) (citing OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005)).[2]  Courts and the OIG have concluded that a "remuneration" is "virtually anything of value."  *Id.* (quoting OIG Compliance Program Guidance for Ambulance Suppliers, 68 Fed. Reg. 14245, 14252 (Mar. 24, 2003)).  A person guilty of violating the AKS faces up to five years in prison and a fine up to $25,000.  42 U.S.C. § 1320a-7b(b).  A violation of the AKS may also be a violation of the federal False Claims Act[3] ("FCA") where a claim submitted to the government includes items or services resulting from a violation of the AKS.  *Id.* § 1320a-7b(g).

---

[2]   The Office of the Inspector General ("OIG") for the Department of Health and Human Services offers guidance on the AKS.

[3]   31 U.S.C. § 3729.

3

## II.   Procedural History

### A.   Qui Tam Complaint

On July 15, 2013, a former district sales manager, who worked for CSI from 2012 until February 2013, filed a qui tam[4] action against CSI. (Doc. No. 48-2 ("Qui Tam Complaint") ¶ 9.)  The Qui Tam Complaint alleged that CSI had illegally promoted its PAD devices for off-label purposes and had given illegal kickbacks to physicians for prescribing the PAD devices. (*See id.* ¶ 10.)

Specifically, the Qui Tam Complaint alleged that CSI gave illegal kickbacks to physicians in the form of free trips to training programs at desirable locations in exchange for the physicians buying PAD devices. (*Id.* ¶¶ 50-52.)  Additionally, CSI allegedly marketed the PAD devices as a revenue generator for physicians as compared to less expensive alternatives. (*Id.* ¶ 59.)  CSI also allegedly encouraged physicians to use the PAD devices when they were not medically necessary. (*Id.* ¶ 63.)  In addition, the Qui Tam Complaint alleged that CSI gave illegal kickbacks in the form of free products, such as deals where physicians would buy six devices and get one free. (*Id.* ¶ 69.)  CSI also allegedly offered illegal kickbacks in the form of referrals to doctors in exchange for use of PAD devices. (*Id.* ¶¶ 74, 80-81.)  Finally, the Qui Tam Complaint alleged that CSI selected physicians to be paid speakers for CSI's Speaker Bureau based on which physicians used the most PAD devices and who would drive others to use PAD devices. (*Id.* ¶ 88.)

---

[4]   A qui tam action is one filed by a private person on behalf of the government. *Qui Tam*, Black's Law Dictionary (10th ed. 2014).

At first, the Qui Tam Complaint was filed under seal, concealing its existence from CSI. On May 9, 2014, CSI announced that the U.S. Attorney's Office for the Western District of North Carolina had sent CSI notice that it was investigating the Qui Tam Complaint. On July 8, 2015, the Qui Tam Complaint was unsealed. On June 29, 2016, CSI settled the Qui Tam Complaint in exchange for $8 million and agreeing to a Corporate Integrity Agreement. CSI did not admit any wrongdoing as part of the settlement. (Doc. No. 74 ("Robinson Decl.") ¶ 12, Ex. 5 ("Settlement Agreement") at 2.)

### B.     Class Actions

In the aftermath of the announcement of the Qui Tam Complaint, CSI's stock price fell. Shareholders filed suit in the Central District of California and in the District of Minnesota. On March 26, 2016, this Court appointed Plaintiffs as Co-Lead Plaintiffs. (Doc. No. 25.) And on June 28, 2016, Plaintiffs filed their consolidated complaint. (Doc. No. 48.)

In Plaintiffs' consolidated complaint, they claimed that in early 2012, Kevin Kenny (Executive Vice President of Sales and Marketing) and Jim Breidenstein (Vice President of Sales) implemented a scheme whereby CSI began violating the AKS and the FCA by: (1) providing kickbacks to physicians for using PAD devices, which took the form of either referrals, discounted products, or assistance in establishing office-based laboratories; (2) encouraging physicians to use PAD devices when they were not medically necessary; (3) hiding products so they would be reordered or channel stuffing;[5]

---

[5]     Channel stuffing is a practice of over-shipping goods to inflate sales.

5

and (4) promoting the product for off-label uses. The scheme was allegedly in place from when Breidenstein joined CSI in 2012 until May 9, 2014, when CSI received notice of the Qui Tam Complaint. The consolidated complaint included statements from fourteen confidential witnesses allegedly corroborating Plaintiffs' complaint. On August 29, 2016, Defendants filed a motion to dismiss, which the Court granted with leave to amend.

In Plaintiffs' First Amended Complaint ("FAC") (Doc. No. 86), they adopt an entirely new theory of misconduct: CSI provided marketing services for doctors in exchange for referring others who will purchase CSI devices. Plaintiffs draw their new theory from an employee whistleblower case in California ("Babyak Action"). In the Babyak Action, the employee was allegedly retaliated against for complaining of illegal and unsafe conduct, including illegal kickbacks for referrals.

The marketing-for-referrals scheme was allegedly hatched by an Area Sales Director, Todd Goldberg, who was hired on April 30, 2014 (9 days before CSI announced the Qui Tam Complaint). Goldberg allegedly directed CSI district sales managers to offer marketing services for doctors who referred CSI devices, which he called the Triangle Offense. In discovery for the Babyak Action, different CSI employees stated that the Triangle Offense was Goldberg's idea. Plaintiffs allege that the referral scheme was slowly phased out between May 9, 2014 and August 2015. But when CSI executives learned about the Triangle Offense, they reprimanded Goldberg on April 30, 2015, for failing to obtain approval. (Doc. No. 86-4.)

In addition to the discovery from the Babyak Action, Plaintiffs rely on two confidential witnesses. The first confidential witness was a district sales manager in

6

Los Angeles, California, from September 2014 until August 2016 who heard Goldberg talk about the Triangle Offense. The second confidential witness was a district sales manager in Arizona ("Arizona DSM") from 2008 until 2013, and "confirmed CSI's referral-marketing practices." (FAC ¶ 61.)

### III.   Alleged Misstatements

Plaintiffs allege that CSI made various misstatements and omissions each premised on the same factual predicate: CSI engaged in widespread illegal activity. Broadly, Plaintiffs allege six categories of misstatements:

(1) Statements about past sales growth that Defendants falsely attributed to legitimate practices;

(2) Statements about future sales growth that were falsely attributed to legitimate practices;

(3) Statements about CSI's revenues made while omitting the truth about the Company's illegal referral marketing scheme;

(4) Statements about CSI's legal and regulatory compliance;

(5) Falsely signed Sarbanes-Oxley Act ("SOX") certifications guaranteeing the accuracy of the Company's financial statements; and

(6) Statements and omissions about losses that CSI suffered after discontinuing its illegal referral marketing schemes, as well as costs incurred from sales-force reorganizations necessitated by ending the illegal activities. These include both affirmative falsehoods as to the causes of those losses as well as omissions as to their true causes.

(Opp. at 13 (internal citations omitted).) [6]

## DISCUSSION

### I.  Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id.* at 555.  As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not

---

[6]  Defendants' Memorandum in Support of their Motion to Dismiss (Doc. No. 95) is cited as "Memo."  Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss (Doc. No. 101) is cited as "Opp."  Defendants' Reply brief (Doc. No. 102) is cited as "Reply."

pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

In addition to these general pleading standards, the PSLRA imposes a heightened pleading standard in cases alleging securities fraud. *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010). Under the PSLRA, complaints in a securities fraud action must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)-(2); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). One purpose of the PSLRA was to "put an end to the practice of pleading fraud by hindsight." *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008). But the heightened pleading standard does not amount to an obligation on securities fraud plaintiffs to ultimately prove their allegations, as that "is an altogether different question" from adequately pleading securities fraud. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1325 (2011).

Plaintiffs allege that Defendants violated the anti-fraud provisions of Section 10(b) of the Exchange Act and SEC Rule 10b-5. Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or

9

contrivance in contravention of" SEC rules. 15 U.S.C. § 78j(b). SEC Rule 10b-5 states that it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce . . . [t]o employ any device, scheme, or artifice to defraud, [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5(a)-(c). A plaintiff asserting liability under Section 10(b) and/or Rule 10b–5 must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1028 (8th Cir. 2011) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atl., Inc.*, 552 U.S. 148, 157 (2008)). Defendants argue that Plaintiffs have failed to adequately allege: (1) a material misrepresentation; (2) scienter; and (3) loss causation.

## II. AKS Violations

Plaintiffs' case is premised on the notion that Defendants engaged in widespread illegal sales practices. And as a result of those illegal activities, Plaintiffs contend, a number of Defendants' public statements were false and misleading. The PSLRA imposes a heightened pleading requirement for securities fraud cases. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 980 (8th Cir. 2012). As part of that heightened

10

pleading requirement, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]" *Id.* (alterations in the original) (quoting 15 U.S.C. § 78u-4(b)(1)). To satisfy this heightened pleading standard, "the circumstances of the fraud must be stated with particularity, including such matters as the time, place and contents of false representations, . . . [t]his means the who, what, when, where, and how." *Id.* (alteration in the original) (internal quotation marks omitted).

If a § 10(b) claim is predicated on illegal conduct, then the complaint must allege conduct that if true would be illegal. "If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally flawed." *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006); *accord In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 863, 872 (S.D. Tex. 2016) (concluding that the plaintiffs' claim failed in part because they failed "to plead any facts showing that there were FCPA violations"); *see also Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, Civ. No. 08-6324, 2010 WL 11469576, at *4 (D. Minn. Feb. 3, 2010) ("Plaintiffs have come forward with evidence that, if believed, establishes that Medtronic purposefully promoted the off-label use of Infuse. Defendants' Motion cannot be granted on this basis."). *But see Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1226 (M.D. Fla. 2014) ("The Court finds that plaintiffs in this case need not allege a violation of the FCA in order to properly plead their securities fraud cause of action."), *aff'd*, 608 F. App'x 855 (11th Cir. 2015).

11

The elements of a violation of the AKS are: (1) a remuneration to a person or entity in a position either to purchase goods subject to reimbursement by a federal health care program or to refer a patient whose care will be reimbursed by a federal health care program; and (2) that the remuneration could reasonably induce such referral or such purchase. *See Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015) (citing OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858, 4864 (Jan. 31, 2005)). The OIG has interpreted "remuneration" as being "virtually anything of value." *Id.* Here, Plaintiffs rely on the Qui Tam Complaint, the DOJ settlement and corporate integrity agreement, the Babyak Action, and two confidential witnesses to support their general assertion that CSI violated the AKS.

Even if Plaintiffs could establish isolated or technical violations of the AKS, however, Plaintiffs still fail to state a claim for securities fraud because they cannot adequately plead that the misstatements were made with scienter. To adequately plead scienter, a plaintiff must allege intent to deceive, manipulate, or defraud on the part of the defendant. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 (1976). Scienter may be shown through: (1) facts demonstrating a conscious intent to deceive, manipulate or defraud; (2) allegations of severe recklessness; or (3) allegations of motive and opportunity coupled with knowledge or recklessness. *In re K-Tel Int'l Sec. Litig.*, 300 F.3d 881, 893-94 (8th Cir. 2002). Liability cannot be imposed for negligent conduct alone. *Ernst & Ernst*, 425 U.S. at 201. "A complaint adequately pleads scienter under the PSLRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"

12

*Matrixx Initiatives, Inc.*, 131 S. Ct. at 1324 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).

Here, Plaintiffs contend that they have adequately pleaded scienter based on: (1) the allegations of widespread AKS violations; (2) Martin and Betterley touting CSI's sales; and (3) the importance of PAD devices to CSI.[7] Plaintiffs' theory is that because the PAD devices were 88% of CSI's business and Martin and Betterley emphasized the sales, they knew about widespread AKS violations or were severely reckless in failing to discover the misconduct. Thus, Plaintiffs theory of scienter requires that the AKS violations be widespread and not isolated. Otherwise, it is much more plausible that Martin and Betterley had no idea about isolated, technical violations of the AKS, and therefore Defendants did not act with scienter. *See In re Axis Capital*, 456 F. Supp. 2d at 593 (concluding that the misconduct by two brokers could not impute knowledge of the misconduct onto the company). Again, Plaintiffs rely on the Qui Tam Complaint, the DOJ settlement and corporate integrity agreement, the Babyak Action, and two confidential witnesses.

First, Plaintiffs point to the Qui Tam Complaint as a basis to show a violation of the AKS. In the Qui Tam Complaint, CSI was accused of paying doctors in the form of

---

[7] Plaintiffs also point to allegedly suspicious trades by Martin and Betterley during the Class Period. But Martin and Betterley actual substantially increased their holdings of CSI during the Class Period. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (concluding that an increase in holdings is "wholly inconsistent with fraudulent intent"). Thus, Plaintiffs cannot adequately allege scienter based on the trading.

13

trips and speaking fees.  Plaintiffs allege that CSI began phasing out its referral scheme on May 9, 2014, after it received notice of the Qui Tam Complaint.

Next, Plaintiffs point to the DOJ settlement and Corporate Integrity Agreement as evidence of widespread misconduct.  Plaintiffs cite to *Minneapolis Firefighters' Relief Association v. Medtronic, Inc.* for the proposition that a whistleblower settlement and corporate integrity agreement can be used to support inferences of scienter and misconduct even though the settlement denies wrongful conduct.  Civ. No. 08-6324, 2010 WL 11469576 (D. Minn. Feb. 3, 2010).  In that case, however, Medtronic settled the whistleblower case before the class period started.  *Id.* at *2.  The shareholders in *Medtronic* alleged that despite a $40 million settlement, Medtronic continued to illegally promote its device for off-label use, which accounted for 85% of that device's sales.  *Id.*  Here, Plaintiffs make no similar allegations.  Indeed, Plaintiffs contend that the wrongful conduct was phased out due to the DOJ investigation.  Thus, *Medtronic* cannot be used to show that CSI was aware of or engaged in widespread misconduct based on its settlement and corporate integrity agreement.

Third, Plaintiffs point to the Triangle Offense described in the Babyak Action. But if anything, the Babyak Action confirms that the misconduct here was not widespread because the complaining employees stated the Triangle Offense was all Todd Goldberg's idea, and CSI reprimanded Goldberg for failing to vet the program through

14

company executives.[8]  Further, Goldberg was hired nine days before CSI learned of the Qui Tam Complaint and allegedly began phasing out its referral-for-marketing scheme.

Last, Plaintiffs point to the statements from the two confidential witnesses.  Unlike other factual allegations in a complaint, courts are not required to wholly accept as true statements from a confidential witness.  *Minneapolis Firefighters' Relief Ass'n v. MEMC Elec. Materials, Inc.*, 641 F.3d 1023, 1030 (8th Cir. 2011) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757-58 (7th Cir. 2007)).  Here, the confidential witnesses fail to demonstrate that the AKS violations were widespread.  The first confidential witness was hired in September 2014, after CSI began allegedly phasing out the illegal conduct.  Additionally the first confidential witness worked in Los Angeles, California—the same area as Babyak.  Thus, the first confidential witness, at best, repeats the allegations in *Babyak* regarding the Triangle Offense.  The Court concludes that the first confidential witness does not support the conclusion that AKS violations were widespread.

The other confidential witness, the Arizona DSM, alleges that sales representatives would cause podiatrists to refer patients to physicians who used CSI products and cut off the referrals if the physicians did not use CSI products.  For example, the sales representatives would leave referral sheets with podiatrists who would then refer patients.  While the second confidential witness provides details of an alleged AKS scheme, there

---

[8]  Plaintiffs also point to a statement in the Babyak Action where one employee stated that the Triangle Offense was similar to previous sales programs at CSI.  Plaintiffs, however, fail to flesh out in their complaint how the programs were similar.  In particular, Plaintiffs fail to demonstrate that the programs were similar in that they were all similarly illegal.  Thus, the Court declines to credit the statements of Babyak employees as confirmation of widespread misconduct at CSI.

is no basis to impute the scheme beyond his sales area. Thus, the Arizona DSM does not support the conclusion that AKS violations were widespread.

In sum, Plaintiffs' allegations amount to a patchwork of alleged misconduct. There is the Qui Tam Complaint that alleges trips and speaking fees for referrals; the Babyak action that alleges the Triangle Offense; and the Arizona DSM allegations of leaving referral sheets of doctors who used CSI products. The competing inferences are either that these were isolated incidents or part of more widespread misconduct. The Court concludes that the more plausible explanation is that the conduct was isolated. Plaintiffs have therefore failed to state a claim because they cannot show that Defendants knew about the AKS violations or were severely reckless in not discovering them. Thus, the Court dismisses Plaintiffs' § 10(b) claim.[9]

## III.   Section 20(a) of the Exchange Act

Plaintiffs argue that Betterley is liable under Section 20(a) of the Exchange Act, which establishes joint and several liability for "[e]very person who, directly or indirectly, controls any person liable" for violations of the securities laws, "unless the

---

[9]   Plaintiffs also cite to *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878 (D. Minn. 2011). In that case, shareholders brought a securities fraud claim alleging that St. Jude was misrepresenting its future sales projections because it had saturated the market through channel stuffing. Thus, whether St. Jude engaged in wrongful conduct was largely irrelevant. *See id.* at 891. Instead, the issue was whether St. Jude had misled investors by saying its sales would be stable when the market was saturated. *See id.* Here, in contrast, Plaintiffs' claims require that the conduct was illegal. *St. Jude* therefore does not dictate a different result here.

controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t.

A claim under Section 20(a) for control person liability is derivative of a primary claim, and therefore the failure to satisfactorily plead a Section 10(b)/Rule 10b-5 claim also precludes a Section 20(a) claim. *See, e.g.*, *Lustgraaf*, 619 F.3d at 874. Because the Court dismisses Plaintiffs' primary claim, the Court likewise dismisses Plaintiffs' Section 20(a) claim.[10]

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint (Doc. No. [93]) is **GRANTED** consistent with the memorandum above.

2. Plaintiffs' Amended Complaint (Doc. No. [86]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  January 10, 2018           s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge

---

[10] The PSLRA requires that "upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). The Court finds that both parties complied with Rule 11.